UNITED STATES, Appellant,

v.

Kevin E. PORTER, Appellee.

No. 91–CO–1277.

District of Columbia Court of Appeals.

Argued June 30, 1992.
Decided Dec. 22, 1992.

Henry K. Kopel, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Thomas J. Tourish, Jr., Patricia A. Riley, and Wanda G. Bryant, Asst. U.S. Attys., Washington, DC, were on the briefs, for appellant.

Ronald A. Goodbread, Alexandria, VA, appointed by this court, for appellee.

David Reiser, with whom James Klein, Elizabeth G. Taylor, Rosemary Herbert, and Janet C. Hoeffel, Washington, DC, were on the briefs, for Public Defender Service, amicus curiae.

Before STEADMAN and SCHWELB, Associate Judges, and MACK, Senior Judge.

SCHWELB, Associate Judge:

This appeal presents our court for the first time with the question whether

"DNA" profiling evidence is admissible to corroborate the identification of a defendant in a criminal case. Provided that, as we anticipate, certain limited questions are successfully resolved on remand, the proponents of a technology which we view as a potentially valuable tool in the search for the truth carry the day.

I

THE FACTS

A grand jury indicted Kevin E. Porter on February 28, 1990, on one count of rape, D.C.Code § 22–2801 (1989), and one count of carnal knowledge. *Id.* The indictment was precipitated by Porter's alleged sexual assault upon the fourteen year-old sister of his girlfriend. Before trial, the prosecution filed a motion requesting the court for leave to introduce expert testimony that the deoxyribonucleic acid (DNA) extracted from semen specimens taken from the crime scene matched the DNA taken from Porter's blood. The government also sought to introduce evidence that the probability of a coincidental DNA match between two unrelated black males was no higher than one in thirty million.[1] The DNA evidence was thus intended to corroborate the complainant's expected identification of Porter as her assailant and to demonstrate that it was extremely improbable that someone other than Porter had committed the crime.

In response, Porter asked the court to exclude the proffered DNA identification evidence. He argued that the technology that the FBI had used to determine that his own DNA matched the DNA taken from the semen samples was lacking in quality control assurance and had not been generally accepted in the relevant scientific community. Porter also contended that the methodologies used by the FBI to calculate "coincidental match probabilities" likewise lacked general scientific acceptance. As a result, Porter argued, the government's proffered DNA evidence failed to meet the standard for the admissibility of novel sci-

entific techniques set forth in the landmark case of *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013 (1923).

Porter's case was consolidated with eleven other prosecutions in which the admissibility of DNA evidence was at issue. During the twenty-day *Frye* hearing which followed, the judge heard testimony from eight expert witnesses, admitted over 110 exhibits, and received over 1,300 pages of briefs. The judge later issued an order, accompanied by a 93–page opinion, in which he held that the proffered DNA identification evidence was inadmissible. *United States v. Porter*, 120 Daily Wash. L.Rptr. 477 (Super.Ct.D.C.1991). The judge concluded that the FBI's method for determining that a defendant's DNA matched DNA taken from the crime scene was based on procedures generally accepted in the scientific community as reliable. He ruled, however, that the FBI's procedure for calculating coincidental match probabilities, and for arriving at the figure of one in thirty million, were not based on generally accepted techniques, and that the proffered evidence was therefore inadmissible under *Frye*. The judge observed that a number of studies were pending on the subject of the forensic use of DNA evidence and were expected to address issues with respect to which, as of the time of writing, there was scientific disagreement. He stated that "[i]t is *after* these studies and others, such as the study which is being prepared by the National Academy of Sciences [NAS] have been completed, when the court should be called upon to admit DNA evidence, not before." (Emphasis in original). *Id.* at 507.

In the *Porter* case only, the government filed a pretrial appeal pursuant to D.C.Code § 23–104(a)(1) (1989). During the pendency of the appeal, the National Research Council of the NAS issued the comprehensive and long-awaited report dealing with forensic DNA methodologies to which the judge alluded in his opinion. *See* COMMITTEE ON DNA TECHNOLOGY IN FORENSIC SCIENCE, NA-

---

**1.** The government later amended its probability estimate to one in forty million. Now, before this court, it essentially takes the position that

the figure of one in 270,000 may also be presented to the jury.

TIONAL RESEARCH COUNCIL, DNA TECHNOLO-GY IN FORENSIC SCIENCE (1992) [hereinafter NRC REPORT]. In response to the NRC REPORT, the parties and the Public Defender Service, as *amicus curiae*, filed supplemental submissions to their already imposing briefs.[2]

We hold, essentially for the reasons stated by the trial judge, that the FBI's procedures for determining a match pass muster under *Frye*. We also agree with the judge that there was no consensus within the relevant scientific community in support of the FBI's calculation that the probability of a coincidental match was no higher than one in thirty million (or, *a fortiori*, one in forty million). We specifically decline the government's invitation to hold that the position of one group of distinguished scientists (those favoring the government's position) is more persuasive, as a matter of molecular biology or population genetics, than the position of an apparently equally distinguished group of scholars who have reached an *opposite conclusion; indeed, we view the government's position on this issue as contrary to *Frye*. We thus agree with the trial judge's resolution of the principal issues which he addressed.

Nevertheless, we remand the case to the trial court. We do so for two reasons. First, at least in our view, the NRC REPORT, which was not available to the trial judge, suggests that the DNA evidence should be admitted on the basis of a probability calculation for which the requisite consensus may now exist. Second, we think it important to clarify a point on which the parties have not significantly focused, but which may considerably simplify the issue before the court.

We hold that it is not necessary for the prosecution to prove, in order that DNA evidence be admitted, that there is a scientific consensus as to the precise probability of a coincidental match. So long as there is a consensus that the chances of such a match are no greater than some very small[3] fraction, then the evidence is probative and should be admitted on an appropriately conservative basis. If, as the information available to us now suggests, reputable scientists would agree on some such minimal figure as the bottom limit of the possibility of a coincidental match, the evidence will be admissible under the *Frye* standard. On remand, however, Porter must have the opportunity to contest, if he can, the sufficiency of the government's showing that the relevant scientific consensus, as defined in this opinion, now exists.

## II

### ALLELES, CHROMOSOMES, AND POLYMORPHISMS—THE NATURE OF DNA IDENTIFICATION EVIDENCE[4]

"The techniques of DNA typing are fruits of the revolution in molecular biology that is yielding an explosion of information about human genetics." NRC REPORT, *supra*, at 2. The opinion of the trial court contains a detailed exposition of the technology on which the prosecution relies in this case. *Porter*, 120 Daily Wash.L.Rptr. at 483–85; *see also United States v. Jakobetz*, 955 F.2d 786, 791–93 (2d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 104,

---

2. Porter's initial brief, for example, is 241 pages long, not including the fifty-seven exhibits appended to it.

3. We need not here determine how small that fraction may be, since it does not appear that the trial court will be dealing with probabilities less than one in many thousand. Moreover, in the present case, the evidence is offered to corroborate the identification of Porter as the assailant, and the entire prosecution case does not depend on the expert testimony. We emphasize that we are dealing here with the admissibility of the evidence, and not with its sufficiency, standing alone, to convict a defendant.

4. In order to keep this opinion within reasonable bounds, we adopt, but do not set forth *de novo*, the trial judge's comprehensive summary of the testimony of the six prosecution experts and two defense experts who gave evidence at the *Frye* hearing. *See Porter, supra,* 120 Daily Wash.L.Rptr. at 485–87, 89–93. We note that the judge also considered the extensive testimony of expert witnesses for the prosecution and for the defense in *United States v. Yee*, 134 F.R.D. 161 (N.D.Ohio 1991), as set forth in the unusually detailed report of the federal magistrate in that case. *See Porter supra,* 120 Daily Wash.L.Rptr. at 495 n. 47.

121 L.Ed.2d 63 (1992). We attempt our own brief summary, in lay terms, of an esoteric but fascinating subject.

DNA is sometimes called the blueprint of life. It contains the chemical instructions for all of life's processes, as well as the "genetic code" that defines who we are, what we look like, and where our talents lie. With the exception of identical twins, no two people have the same DNA. The makeup of one's DNA remains constant throughout one's life. In recent years, forensic technologies have been developed for removing the DNA from human cells discovered at crime scenes and for comparing the evidentiary sample with the suspect's DNA. We must determine whether these technologies pass muster under *Frye.*

Embedded within the nucleus of virtually every cell of each human being's body are forty-six rod-shaped chromosomes. Half of these chromosomes are inherited from one's mother and half are inherited from one's father. Each chromosome has the shape of a twisted ladder or spiral staircase. The "banisters" of this staircase are made of phosphates and sugars, while the "steps" or "rungs" consist of "base pairs," or pairs of amino acids bound together. A single DNA molecule—itself not a very large entity—contains about *three billion* base pairs.

Located at specific sites, or "loci," along each chromosome are large groups of base pairs known as "alleles," or "genes." Over 99% of these genes are identical among all human beings. These genes define us as persons, rather than animals, plants, or other forms of life. They account for the many shared characteristics of all human beings. The remaining genes—known as "polymorphic" genes because they vary in form from person to person—account for our unique characteristics as individuals. Many polymorphic genes are known to have definite functions: some are responsible for the color of our hair and of our eyes, some for the shape of our body and the type of our blood. Other polymorphic genes, however, appear to have no function whatever. These "junk DNA" segments, which typically consist of varying lengths of repeating sequences of base pairs, form the basis for the DNA identification evidence at issue in this case.

The remarkable technology which has provided molecular biologists with an entree into the wonders of sub-microscopic exploration has not yet enabled them to compare every base pair in one DNA molecule with every base pair in another to determine conclusively that the two molecules are, in fact, identical. Forensic scientists, seeking to apply the new technology to identify the guilty and to vindicate the innocent, have developed a "shortcut" for making this determination. After extracting and "cutting" DNA from cells taken from the crime scene and from cells taken from the defendant, they isolate, from each sample, maternal and paternal fragments of "junk DNA" from four different loci, and measure the length of the repeating sequence in each fragment. In other words, rather than comparing every base pair in the two DNA molecules, they compare eight of the defendant's genes against the genes in the same locations on the evidentiary sample DNA to see if they are consistent with each other. This process is known as "restriction fragment length polymorphism," or, more manageably, as RFLP. It is aimed at measuring the "variable number of tandem repeats," a concept which DNA aficionados rattle off as VNTR.

Because each person has thousands of polymorphic genes, it is theoretically possible for two people to have identical genes in these four locations on their DNA molecules but to have differences—perhaps even hundreds of differences—in other locations. Accordingly, once it has been determined that the defendant's DNA and the DNA from the evidentiary sample share identical patterns at all four of the locations examined, scientists calculate the possibility that the match is merely a coincidence and that the two samples did not actually come from the same person.

Making that calculation is generally the role of human population geneticists. The particular system followed by the FBI and presented by the prosecution to the trial

court is known as "fixed bin analysis." Scientists utilizing this process first estimate, for each of the loci which was analyzed on the defendant's DNA, the fraction of people in the defendant's broad racial or ethnic group, e.g., Caucasian, Black American, or Hispanic, with genes at that locus identical to the defendant's genes. They then perform a series of multiplications to determine the fraction of the defendant's group with identical DNA fragments at all four of the loci examined. The resulting fraction is generally an astronomically low one.[5]

## III

## LEGAL DISCUSSION

*A. The Frye Test.*

In this jurisdiction, the starting point of our legal inquiry must be the test enunciated in *Frye:*

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

54 App.D.C. at 47, 293 F. at 1014. Although it is now forty years since James Watson of the United States and Francis Crick of Great Britain received the Nobel Prize for their pioneering work on the DNA molecule, *see People v. Axell,* 235 Cal.App.3d 836, 845, 1 Cal.Rptr.2d 411, 415 (1991), *review denied,* (1992), forensic use of DNA technologies is of comparatively recent vintage (but boundless potential). *See People v. Wesley,* 140 Misc.2d 306, 307–11, 533 N.Y.S.2d 643, 644–46 (1988), (*Wesley I*), *aff'd* 183 A.D.2d 75, 589 N.Y.S.2d 197 (3d Dept.1992) (*Wesley II*). The use of DNA evidence in criminal cases is at the "cutting edge" of forensic science. *Wesley I, supra,* 140 Misc.2d at 307, 533 N.Y.S.2d at 644. This appeal therefore presents the very kind of issue which the quoted language from *Frye* was designed to address.

As Judge McGowan explained for the court in *United States v. Addison,* 162 U.S.App.D.C. 199, 201, 498 F.2d 741, 743 (1974),

> the *Frye* standard retards somewhat the admission of proof based on new methods of scientific investigation by requiring that they attain sufficient currency and status to gain the general acceptance of the relevant scientific community.

Some jurisdictions have therefore abandoned *Frye* for a more liberal approach. *See, e.g. Jakobetz, supra,* 955 F.2d at 794. This court, however, continues to adhere to the traditional standard. *Street v. Hedgepath,* 607 A.2d 1238, 1244 (D.C.1992); *Jones v. United States,* 548 A.2d 35, 39–40 (D.C.1988); *Ibn–Tamas v. United States,* 407 A.2d 626, 637–39 (D.C.1979).

■ We agree with the government that, under *Frye,* the proponent of a new technology must demonstrate by a preponderance of the evidence that this technology has been generally accepted in the relevant scientific community. *Yee, supra,* note 4, 134 F.R.D. at 195–96; *see also Jakobetz, supra,* 955 F.2d at 796 (declining in DNA case, to require proof of reliability beyond a reasonable doubt); *United States v. Roy,* 114 Daily Wash.L.Rptr. 2481, 2489 (Super.Ct.D.C.1986);[6] *cf. Kelly v. State,* 824 S.W.2d 568, 573 (Tex.Cr.App.1992) (requir-

---

**5.** The technical details of fixed bin analysis are not easy for a lay person to comprehend. In light of our disposition of this case, we do not find it necessary to try to explicate in our own words such esoteric principles as "Hardy–Weinberg equilibrium," or "linkage disequilibrium." *See State v. Pennell,* 584 A.2d 513, 517 (Del.Super.1989), *on rehearing, id.* at 521–22; (defining Hardy–Weinberg equilibrium). For more detailed descriptions of the technology of proba-

bility estimates, *see Porter,* 120 Daily Wash. L.Rptr. at 485; and *United States v. Bridgett,* 120 Daily Wash.L.Rptr. 1697, 1700–01 (Super.Ct.D.C.1992).

**6.** Judge Burgess' opinion in *Roy* has been characterized by this court as "cogent ... thoughtful and comprehensive." *Jones, supra,* 548 A.2d at 45.

ing proof of reliability in DNA case to be by clear and convincing evidence; Texas is a non-*Frye* jurisdiction, however, and general acceptance need not be demonstrated).

Given the requirement in *Frye* of "general acceptance," "[t]he issue is consensus versus controversy over a particular technique, not its validity." *Jones, supra,* 548 A.2d at 42 (citation omitted). As we bluntly put it in *Jones,* the prime focus is "on counting scientists' votes, rather than [on] verifying the soundness of a scientific conclusion." *Id.; but cf. People v. Mohit,* 153 Misc.2d 22, 579 N.Y.S.2d 990, 992 (Westchester County Ct.1992) (counting heads rarely feasible and can be of dubious value). Courts recognize that some "scientists" will testify to almost anything,[7] and unanimity is not required. *People v. Middleton,* 54 N.Y.2d 42, 49, 429 N.E.2d 100, 103, 444 N.Y.S.2d 581, 584 (1981); *cf. Yee, supra,* 134 F.R.D. at 166, 197, 202. Nevertheless, general acceptance is *general* acceptance. If "scientists significant either in number or expertise publicly oppose [a new technique] as unreliable," then that technique does not pass muster under *Frye. People v. Shirley,* 31 Cal.3d 18, 56, 181 Cal.Rptr. 243, 266, 723 P.2d 1354, 1377 (1982) (en banc).

The consensus that will satisfy *Frye* "is that of scientists, not courts," *People v. Reilly,* 196 Cal.App.3d 1127, 1135, 242 Cal. Rptr. 496, 500 (1987), for "[a] courtroom is not a research laboratory." *United States v. Brown,* 557 F.2d 541, 556 (6th Cir.1977). Accordingly, "the court may not resolve a scientific dispute between opponents and proponents of the technique, [and] the very existence of the dispute precludes admission of the testimony." *Starr v. Campos,* 134 Ariz. 254, 257, 655 P.2d 794, 797 (1982); *cf. Friend v. Friend,* 609 A.2d 1137, 1139–

40 (D.C.1992) (distinguishing the existence of dispute from the merits of that dispute).

We have stated that the *Frye* test "begins—and ends—with ... whether there is general acceptance of a particular scientific methodology, not an acceptance, beyond that, of particular study results based on that methodology." *Ibn–Tamas, supra,* 407 A.2d at 638. The trial judge held, and we agree, that under the *Ibn–Tamas* articulation, "what must be generally accepted is forensic DNA analysis and not ... beyond that ... the results of that analysis in a particular case." *Porter,* 120 Daily Wash.L.Rptr. at 494.[8]

■ The trial judge also rejected the prosecution's tentative (and somewhat astonishing) proposal that he severely restrict the categories of scientists whose views he should consider in assessing general acceptance:

It simply is not creditable to argue, and the government does not do so with much enthusiasm, that general acceptance may be premised simply on the opinion of forensic scientists. Were it otherwise, there would have been no need for a month-long *Frye* hearing. There is no question but that forensic scientists accept—no qualifier is necessary—forensic DNA evidence and believe that the time has come for its use as powerful evidence in criminal trials. While views of forensic scientists have weight and must be considered, "members of the relevant scientific field will include those whose scientific background and training are sufficient to allow them to comprehend and understand the process and form a judgment about it." *Reed v. State,* 283 Md. 374, 391 A.2d 364, 368 (1978). This court holds that this formulation states the relevant scientific field.

*McKay v. State,* 155 Tex.Crim. 416, 419, 235 S.W.2d 173, 174 (1950).

7. We will take judicial knowledge of the scientific fact that the earth is round. At the same time, we know there are still individuals who claim to be scientists who have other theories, even to the extent of holding that instead of living on the outer surface of a globe we live within a globe, and that there are within it sun, moon, stars and all the heavenly bodies which we observe.

8. *Cf. Yee, supra,* 134 F.R.D. at 197 (the question is whether "the pertinent scientific community generally accepts the ability of the FBI's protocol and procedures to ... provide a scientifically acceptable estimate of the relative rarity of the particular pattern in the [relevant] population.")

*Porter*, 120 Daily Wash.L.Rptr. at 495 (footnote omitted). We agree with the judge. *See also Axell, supra*, 235 Cal. App.3d at 857, 1 Cal.Rptr.2d at 424 ("[s]ince DNA profiling is an amalgamation of primarily two disciplines, molecular biology and population genetics . . ., it appears logical to consider its acceptance by those communities for forensic use.")

### B. The Scope of Review.

■■ Generally, the decision whether or not to admit expert testimony is addressed to the sound discretion of the trial court. *Street, supra*, 607 A.2d at 1244; *Jones, supra*, 548 A.2d at 38. Where the question of the general acceptance of a new scientific technique is raised, however, the proponent will often be asking the court to establish the law of the jurisdiction for future cases. *Jones, supra*, 548 A.2d at 40. This is certainly true in the present instance. Accordingly, in recognition of the fact that the formulation of the law of this jurisdiction is a quintessentially appellate function, *see Griffin v. United States*, 618 A.2d 114, 117–119 (D.C. Dec. 18, 1992), we engage in a broad review of the trial judge's determination whether the forensic use of DNA technology has gained general acceptance. *Jones, supra*, 548 A.2d at 40. In doing so,

we may consider not only expert evidence of record, but also judicial opinions in other jurisdictions, as well as pertinent legal and scientific commentaries. *Id.* at 41. The amount of reading which the parties and *amicus* have invited us to undertake has therefore been challenging to say the least.

### C. Determining a Match.

■■ During the *Frye* hearing, Porter subjected the FBI's RFLP procedure for determining a match between his own DNA and the evidentiary sample to a "blunderbuss" attack[9] from a number of different directions.[10] He reargues most or all of his contentions in this court, often in colorful if not altogether understated rhetoric.[11]

The trial judge addressed each of Porter's contentions in considerable detail. He concluded that the method of DNA typing used by the FBI forensic laboratory was generally accepted in the scientific community. *Porter*, 120 Daily Wash.L.Rptr. at 503. He found some of the defense objections to the FBI's procedures to be overstated, some irrelevant, and some unsupported by scientific evidence. *Id.*

---

**9.** "In objecting to the admission of this evidence, the defendant has adopted a 'scorched earth' strategy, one which leads him to object to virtually each and every aspect of this evidence and, even, to question the motives of its proponents." *Porter*, 120 Daily Wash.L.Rptr. at 501.

**10.** Porter challenged, *inter alia*, the following:
1) the FBI's practice of declaring a match by both visual and computer-assisted means;
2) the FBI's failure to replicate test results;
3) the inability of the FBI to precisely measure the VNTR;
4) the absence of standards governing forensic DNA typing;
5) the FBI's purported lack of a blind proficiency testing program; and, in light of the foregoing,
6) the alleged existence of a significant danger that a false positive could be called a match.
*See Bridgett, supra*, note 5, 120 Daily Wash. L.Rptr. at 1701; *see also Mohit, supra*, 579 N.Y.S.2d at 994–95, discussing the use of Ethidium Bromide during gel electrophoresis, a process described in *Jakobetz, supra*, 955 F.2d at 792. The recent decision of the Supreme Court

of Minnesota in *State v. Jobe*, 486 N.W.2d 407, 419–20 (Minn.1992) contains a concise and persuasive analysis of the objections commonly offered to the FBI's RFLP matching procedure.

**11.** *E.g.*, the government displays a "virtual mania to get this evidence before a jury," Appellee's brief at 40 n. 95; the FBI "is as disingenuous as its terminology is artful," *id.* at 41; the government's position is "audacious," *id.* at 42; "the so-called 'blind' proficiency testing 'program' of the FBI is a sham," *id.* at 50; "[f]or the government to make that proffer in the instant litigation borders on the absurd," *id.* at 56; "the hyperbole of the FBI and its fellow travelers [!!] in the DNA lobby," *id.* at 82 (this must be one of the few occasions on which the FBI has been "red-baited"); the FBI is "[l]ike the evangelist quoting his own scripture as authority . . .," *id.* at 94; "the entire 'galaxy' of pro-FBI 'stars,'" *id.* at 135; *"nudum dictum,"* *id.* at 139; pro-DNA scientists' "concatenation of broad, flat assertions without supporting authority are simply too ponderous to swallow whole," *id.* at 145; the NRC Report is not a "papal encyclical," *id.* at 191; NRC's "suggested practice which may be 'robust' scientific theory but which is 'moribund' due process of law." *Id.* at 206.

The recent NRC REPORT has generally reinforced the judge's views. *See Bridgett, supra,* 120 Daily Wash.L.Rptr. at 1703–04. Neither Porter, nor the Public Defender Service as *amicus curiae,* has brought to our attention any judicial decision holding or even implying that the FBI's technology for determining a match (as distinguished from its methodology for calculating the probability of a coincidental match) lacks general acceptance in the relevant scientific community.[12] The case law overwhelmingly supports the trial judge's conclusion that the "match" technology is generally accepted. *See State v. Vandebogart,* —— N.H. ——, —— ——, 616 A.2d 483, 491–93 (1992); *State v. Davis,* 814 S.W.2d 593, 602 (Mo.1991); *Axell, supra,* 235 Cal. App.3d at 856 & n. 7, 1 Cal.Rptr.2d at 422–23 & n. 7; *Wesley II, supra,* 183 App. Div.2d at 77–79, 589 N.Y.S.2d at 199–201; *Bridgett, supra,* 120 Daily Wash.L.Rptr. at 1703–04, all citing numerous precedents.

For the reasons stated by the trial judge in this case and by the courts in the opinions cited above, we are satisfied that, provided the FBI's methodology is properly carried out, the possibility of a false positive match is negligible. "Even if [an erroneous match] were theoretically possible ... the statistical likelihood of an artificial match at all eight bands is extraordinarily low." *Axell, supra,* 235 Cal.App.3d at 860, 1 Cal.Rptr.2d at 426. "Clinical errors are far more likely to cause an inconclusive or no match result than a false positive." *Mohit, supra,* 579 N.Y.S.2d at 995. Any failure by the scientists to adhere to the appropriate procedure is, of course, a proper subject of inquiry, but does not raise an issue which implicates *Frye.*

*D. The Prosecution's Statistical Calculations and the Controversy Among Scientists.*

■ In the trial court, the prosecution elected to put all of its eggs in a single basket. It contended below, and maintains on appeal, that there was general accep-

tance in the relevant scientific community, within the meaning of *Frye,* of the statistical methodology by which the possibility of a random match was calculated as being one in thirty million. The trial judge rejected this contention, noting the existence of a substantial controversy among distinguished scientists as to the soundness of certain assumptions on which this calculation was predicated. *Porter,* 120 Daily Wash.L.Rptr. at 505–06. We agree with the trial judge's analysis, which has been further reinforced by subsequent events.

In the very recent case of *People v. Barney, et al.,* 8 Cal.App. 4th 798, 10 Cal. Rptr.2d 731 (1st Dist.1992), the California prosecutor presented essentially the same arguments as the government is making here. The court was not persuaded. We quote at length from Judge Chin's lucid analysis for the unanimous court in *Barney:*

There is currently a fundamental disagreement among population geneticists concerning the determination of the statistical significance of a match of DNA patterns. The dispute was recently featured in a leading scientific journal, Science, in which Richard C. Lewontin of Harvard University and Daniel L. Hartl of Washington University attack the reliability of DNA statistical analysis, while Ranajit Chakraborty of the University of Texas and Kenneth K. Kidd of Yale University defend it. (Lewontin & Hartl, *Population Genetics in Forensic DNA Typing* (Dec. 20, 1991) Science, at p. 1745 (hereafter Lewontin & Hartl) Chakraborty & Kidd, *The Utility of DNA Typing in Forensic Work* (Dec. 20, 1991), Science, at p. 1735 (hereafter Chakraborty & Kidd)).

Lewontin and Hartl question the reliability of the current method of multiplying together the frequencies with which each band representative of a DNA fragment appears in a broad data base. The problem, they say, is that this method is based on incorrect assumptions that (1) members of the racial groups represent-

---

12. *But cf. People v. Pizarro,* 10 Cal.App.4th 57, 95–96, 12 Cal.Rptr.2d 436, 461 (5th Dist.1992) (trial court must determine whether private laboratory's RFLP protocol is generally accepted as reliable within scientific community).

ed by the broad data bases—Caucasians, Blacks, and Hispanics—mate within their groups at random, i.e., without regard to religion, ethnicity, and geography, and (2) the DNA fragments identified by DNA processing behave independently and thus are "independent in a statistical sense"—i.e., in the language of population genetics, they are in 'linkage equilibrium.' (Lewontin & Hartl, *supra,* at p. 1746.)

Lewontin and Hartl claim that, contrary to the assumption of random mating, ethnic subgroups within each data base tend to mate endogamously (i.e., within a specific subgroup) with persons of like religions or ethnicity or who live within close geographical distance. Such endogamous mating tends to maintain genetic differences between subgroups—or substructuring—which existed when ancestral populations emigrated to the United States and has not yet had sufficient time to dissipate. As a result, the subgroups may have substantial differences in the frequency of a given DNA fragment—or VNTR allele—identified in the processing step of DNA analysis. A given VNTR allele may be relatively common in some subgroups but not in the broader data base. (Lewontin & Hartl, *supra,* at pp. 1747–1749.)

\* \* \* \* \* \*

Lewontin and Hartl conclude that because the frequency of a given VNTR allele may differ among subgroups, reference to a broad data base may produce an inaccurate frequency estimate for a defendant's subgroup. The current multiplication method may greatly magnify the error. The resulting probability for the defendant's entire DNA pattern may be in error by two or more orders of magnitude (e.g., 1 in 7.8 million could really be 1 in 78,000). (Lewontin & Hartl, *supra,* at p. 1749.)

Chakraborty and Kidd strongly disagree. They contend that Lewontin and Hartl exaggerate both the extent of endogamy in contemporary America and the effect of substructuring on the reliability of DNA statistical analysis. They concede there is substructuring (and thus variance of VNTR allele frequencies) within the data bases but assert its effect on the reliability of frequency estimates is "trivial" and "cannot be detected in practice." (Chakraborty & Kidd, *supra,* at pp. 1736–1738.)

In an article introducing the Lewontin–Hartl and Chakroborty–Kidd articles, Science describes Lewontin and Hartl as "two of the leading lights of population genetics" who "have the support of numerous colleagues." (Roberts, *Fight Erupts Over DNA Fingerprinting* (Dec. 20, 1991) (Science, at p. 1721 (hereafter *Fight Erupts* )). A population geneticist at the University of California at Irvine is said to agree "that the current statistical methods could result in 'tremendous' errors and should not be used without more empirical data." (*Id.* at p. 1723.) The introductory article describes the debate as "bitter" and "raging," stating that "tempers are flaring, charges and countercharges are flying.... [ ] Dispassionate observers, who are few and far between, say that the technical arguments on both sides have merit.... [T]he debate is not about right and wrong but about different standards of proof, with the purists on one side demanding scientific accuracy and the technologists on the other saying approximations are good enough." (*Id.,* at p. 1721.) Science concludes that the Lewontin–Hartl and Chakraborty–Kidd articles "seem likely to reinforce the notion that the [scientific] community is indeed divided" under the *Frye* standard, although the issue may become moot within a few years "with the expected introduction of even more powerful DNA techniques...." (*Id.* at p. 1723.)

The NRC report, which was released four months after the Science articles, acknowledges there is a "[s]ubstantial controversy" concerning the present method of statistical analysis. (NRC rep., *supra,* at p. 74.) The report does not, however, choose sides in the debate, but instead "assume[s] for the sake of discussion that population substructure

may exist. . . ." (NRC rep., *supra*, at pp. 12, 80; see also *id.* at p. 94.)

\*    \*    \*    \*    \*    \*

Evidently, Lewontin and Hartl—along with their colleagues who agree with them,—are significant in both 'number' and 'expertise.' [Citation omitted.] Science describes Lewontin and Hartl as "two of the leading lights of population genetics" who "have the support of numerous colleagues," and quotes a third population geneticist (Francisco Ayala) who agrees with the above criticism. (*Fight Erupts, supra,* at p. 1721.) Lewontin has been described by one of his colleagues as 'probably regarded as the most important intellectual force in population genetics alive.' (*U.S. v. Yee* (N.D.Ohio 1991) 134 F.R.D. 161, 181.) Similar criticism of the statistical calculation process of DNA analysis have been leveled by other scientists in previous publications, some of which were admitted in evidence below (e.g., Lander, *DNA Fingerprinting on Trial* (June 15, 1989) Nature, at pp. 501, 504; Cohen, *DNA Fingerprinting for Forensic Identification: Potential Effects on Data Inter-* *pretation of Subpopulation Heterogeneity and Band Number Variability* (1990) 45 Am.J.Hum.Genetics 358, 367).

\*    \*    \*    \*    \*    \*

[T]he point is not whether there are more supporters than detractors,[13] or whether (as the Attorney General and amicus curiae claim) the supporters are right and the detractors are wrong.[14] The point is that there is disagreement between two groups, each significant in both number and expertise (a "[s]ubstantial controversy," in the words of the NRC report). (NRC rep., *supra,* at p. 74.) Even Science, which purportedly sought balance in its coverage of this dispute by commissioning the Chakraborty–Kidd article as a rebuttal to the Lewontin–Hartl article (Roberts, *Was Science Fair to its Authors?* (Dec. 20, 1991) Science, at p. 1722, recognized that the competing articles "seem likely to reinforce the notion that the [scientific] community is indeed divided" under the *Frye* standard. (*Fight Erupts, supra,* at p. 1723.)

Our task under *Kelly*[15]*–Frye* is not to choose sides in this dispute over the relia-

---

13. In its brief on appeal in the present case, the government repeats its argument below that

> the peer-reviewed scientific articles in press at the time of the *Frye* hearing sufficiently demonstrated the general acceptance of fixed bin analysis. More articles have either appeared or been accepted for publication since that time, however, making even more apparent the overwhelming weight of supporting scientific authority. Of the articles and letters in scientific journals that discuss the human population genetics component of forensic DNA analysis, at least 18 peer-reviewed articles and ten letters support the methodology at issue, while only 6 articles and commentaries and 7 letters question it. Further reflecting this broad support, over 45 scientists appear as either authors or co-authors on the "favorable" articles, while only a dozen scientists authored or co-authored the critical articles or letters to the editor.

We think that in the foregoing passage, the government asks this court to choose between scientists on the basis of rather unimpressive numbers, and thus to make precisely the kinds of determinations as to which *Frye* requires a consensus of experts.

14. In light of the "abstruse, intensely technical [scientific] standards involved," *Hopkins v. State,* 579 N.E.2d 1297, 1303 (Ind.1991), courts are well advised not to pick sides in scholarly controversies between eminent scientists about molecular biology or population genetics. As one scholar has observed, "[t]he theory and technology of DNA far surpass everyday knowledge. In fact, only those specifically trained in molecular biology and chemistry [and population genetics] can even begin to understand the concepts involved." Norman, DNA Fingerprinting: *Is It Ready For Trial,* 45 UNIV.MIAMI L.REV. 243, 243–44 (1990). We, therefore, elect instead to heed Lord Mountararat's musical commentary on the House of Lords:

> And while the House of Peers withholds
>   Its legislative hand,
> And noble statesmen do not itch
> To interfere with matters which
>   They do not understand,
> As bright will shine Great Britain's rays
> As in King George's glorious days!

WILLIAM GILBERT & ARTHUR SULLIVAN, IOLANTHE, ACT II (1882). The hereditary peerage is not the only branch of government which can benefit from his lordship's counsel.

15. *People v. Kelly,* 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240 (1976).

bility of the statistical calculation process. Once we discern a lack of general scientific acceptance—which in this instance is palpable—we have no choice but to exclude the "bottom line" expression of statistical significance in its current form.

*Barney, supra,* 8 Cal.App. 4th at 814–19, 10 Cal.Rptr.2d at 740–43; *accord, Pizarro, supra* n. 12, 10 Cal.App. 4th at 78–90, 12 Cal.Rptr.2d at 451–58.

The decisions in *Barney* and *Pizarro* are no aberrations. Although it is true, as the government contends, that the decisions admitting DNA match probabilities outnumber those reaching a contrary result, the imbalance is not as great (and certainly not as significant) as the government suggests. In a majority of the cases in which these match probabilities have been admitted, the defense failed to present evidence of the controversy among scientists which has since been recognized in the NRC Report and described in detail in *Barney*.[16] Indeed, the articles in Science magazine which focused attention on the controversy had not been written at the time that the cases on which the government relies were decided.[17]

In *Commonwealth v. Lanigan,* 413 Mass. 154, 596 N.E.2d 311 (1992), the court, after discussing the NRC's recognition in its report of the current debate among population geneticists, concluded that

> the lively, and still very current, dispute described above regarding the role of population substructure constitutes

something much more than a lack of unanimity. We cannot say that the processes by which Cellmark and the FBI estimated the frequency of the defendants' DNA profiles has found "general acceptance" in the field of population genetics. Accordingly evidence of the estimated frequencies of the defendants' DNA profiles is not admissible. Because the frequency estimates are inadmissible, evidence of a match between profiles is also inadmissible.

*Id.* at 162–63, 596 N.E.2d at 316; (citation omitted). Similarly, in *Bridgett,* Judge Richter wrote that

> while the Defendant's contentions regarding the FBI's RFLP procedure are without merit, the issues raised concerning the FBI's calculation of probability estimates are meritorious. Several courts, including the *Porter* court, have excluded DNA evidence because of either the lack of consensus in the scientific community or the unreliability of probability estimates attached to the declaration of a match. Moreover, many scientific articles have been written on the issue both critical of and in favor of the calculation methodology employed by the FBI.

120 Daily Wash.L.Rptr. at 1704 (footnote [18] and citations [19] omitted). *See also Vandebogart, supra,* —— N.H. at ——–——, 616 A.2d at 493–94; *State v. Houser,* 241 Neb. 525, 545–50, 490 N.W.2d 168, 182–84 (1992); *Commonwealth v. Curnin,* 409 Mass. 218, 220, 565 N.E.2d 440, 442–45 (1991); *State v. Pennell, supra,* note 5, 584 A.2d at 517–

---

**16.** In *Spencer v. Commonwealth,* 238 Va. 275, 289–91, 384 S.E.2d 775, 783 (1989), *cert. denied,* 493 U.S. 1036, 110 S.Ct. 759, 107 L.Ed.2d 775 (1990), a case on which the government relies, defense counsel acknowledged that DNA tests are accepted as reliable and that he was "unable to find or produce one qualified expert to debunk either the theory of DNA printing or the statistics generated therefrom." *But see* the very recent decision in *Satcher v. Commonwealth,* 244 Va. 220, 421 S.E.2d 821, 833–34 (1992), in which the Supreme Court of Virginia adhered to its *Spencer* holding in the face of a much more sophisticated defense presentation.

**17.** "Whatever the merits of the prior decisions on the statistical calculation process … the

debate that erupted in Science in December 1991 changes the scientific landscape considerably and demonstrates indisputably that there is no general acceptance of the current process." *Barney, supra,* 8 Cal.App.4th at 820, 10 Cal. Rptr.2d at 744.

**18.** In the omitted footnote, Judge Richter cited a number of other decisions, some of them unreported, in which evidence of probabilities was excluded for lack of scientific consensus.

**19.** The citations included the Lewontin–Hartl Chakraborty–Kidd brouhaha in Science magazine.

20.[20] To the extent that the decisions of the court and the magistrate in *Yee*, 134 F.R.D. at 165, 202, are to the contrary, we respectfully decline to follow them, especially in light of developments since *Yee* was decided.

The government further argues that the FBI's probability calculation should have been admitted because the defense objections to it go to its weight and not to its admissibility. As the trial judge noted, however, "the government ignores the fact that it is the probability feature which is at the very core of the DNA evidence." *Porter*, 120 Daily Wash.L.Rptr. at 506. "Since a match between two DNA samples means little without data on probability, the calculation of statistical probability is an integral part of the process and the underlying method of arriving at that calculation must pass muster under *Kelly/Frye*." *Axell*, *supra*, 235 Cal.App.3d at 866–67, 1 Cal. Rptr.2d at 430. "[W]e would not permit the admission of test results showing a DNA match (a positive result) without telling the jury anything about the likelihood of that match occurring." *Curnin supra*, 409 Mass. at 222 n. 7, 565 N.E.2d at 442–43 n. 7; *see also Vandebogart, supra*, —— N.H. at ——, 616 A.2d at 494; *Barney*, *supra*, 8 Cal.App.4th at 816, 10 Cal.Rptr.2d at 742.

Since the probability of a coincidental match is an essential part of the DNA evidence, and since there is no consensus as to the accuracy of the FBI's calculation, we decline to hold that the defense objections to *that precise calculation* go only to its weight. *But see State v. Pierce*, 64 Ohio St.3d 490, 494–97, 500–01, 597 N.E.2d 107, 111–12, 115 (1992) (distinguishing cases based on *Frye* and noting that Ohio does not follow *Frye;* court holds that objections to DNA evidence, which included prosecution experts' calculations of odds of forty billion to one against a coincidental match, go to the weight of such evidence but not to its admissibility).

The lack of general acceptance among scientists of the proposition that the FBI's "fixed bin" methodology is sufficiently accurate to support a coincidental match probability of one in thirty (or forty) million, however, does not compel the conclusion that no probability estimate at all may be presented to the jury. As we explain below, demonstration of the existence of consensus among the appropriate scientists as to a more modest calculation would be sufficient.

### E. A More Conservative Consensus?

The parties and the trial judge focused their attention at the *Frye* hearing on the question whether, consistent with *Frye*, the prosecution was entitled to introduce expert evidence to the effect that the probability of a coincidental match was thirty (or forty) million to one. The judge correctly found that there was no general acceptance by the relevant group of scientists for the proposition that the FBI's methodology is sufficiently accurate to support a calculation of these specific odds. There was no inquiry below, however, as to whether such a consensus existed in support of a more conservative figure.

"A criminal trial is not a game, but a quest for truth." *Womack v. United States*, 350 A.2d 381, 383 (D.C.1976); *see also United States v. Nixon*, 418 U.S. 683, 710 & n. 18, 94 S.Ct. 3090, 3108 & n. 18, 41 L.Ed.2d 1039 (1974). "The twofold aim of criminal justice is that guilt shall not escape or innocence suffer." *Nixon, supra*, 418 U.S. at 709, 94 S.Ct. at 3108 (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935)). In the present case, the prosecution seeks to introduce the DNA evidence to corroborate an anticipated identification of Kevin Porter by the complaining witness. "[W]ith today's technology, which uses 3–5 loci,[21] a match between two DNA patterns can be considered strong evidence that the two samples came from the same source." NRC REPORT, *supra*, at 74. There is thus

---

**20.** Cases in which the prosecution's probability calculations were excluded but more conservative estimates were admitted are discussed in Part III D, *infra*.

**21.** In this case, four loci.

no doubt that such evidence is strong; the only real question is: how strong? If the odds against a random match are substantial, then it would be a remarkable coincidence, to say the least, if the complaining witness identified Porter as her rapist, but if the crime was nevertheless committed by someone else whose DNA just happened to match Porter's with respect to each of four loci. "Coincidences happen, but an alternative explanation not predicated on happenstance is often the one that has the ring of truth." *Byrd v. United States*, 614 A.2d 25, 32 (D.C.1992) *(quoting Poulnot v. District of Columbia*, 608 A.2d 134, 139 (D.C. 1992)).

The odds against a coincidental match do not have to be thirty million to one for evidence of the match to be admissible. "[I]f the evidence offered conduces in any reasonable degree to establish the probability or improbability of the fact in controversy, it should go to the jury." *Home Ins. Co. v. Weide*, 78 U.S. (11 Wall.) 438, 440, 20 L.Ed. 197 (1870); *see also Martin v. United States*, 606 A.2d 120, 128–29 (D.C.1991). Accordingly, "[p]opulation percentages on the possession of certain combinations of blood characteristics, based upon established facts, are admitted as relevant to identification." *State v. Washington*, 229 Kan. 47, 59–60, 622 P.2d 986, 995 (1981) (0.6% of the population had defendant's combination of blood factors); *see also Commonwealth v. Gomes*, 403 Mass. 258, 273, 526 N.E.2d 1270, 1279 (1988) (defendant among 1.2% of blacks in United States whose blood was consistent with evidentiary sample); *Plunkett v. State*, 719 P.2d

834, 841 (Okla.Cr.1986) (blood with characteristics of victim found in 0.48% of population); *cf. Jones, supra,* 548 A.2d at 44–45; *but see State v. Kim,* 398 N.W.2d 544 (Minn.1987) (contra, expounding minority rule); *Rivera v. State,* 840 P.2d 933, 942, No. 90–163 (Wyo. Oct. 30, 1992). These principles apply with equal force in DNA cases. *Smith v. Deppish,* 248 Kan. 217, 235–39, 807 P.2d 144, 157–59 (1991); *Martinez v. State,* 549 So.2d 694, 696–97 (Fla. App.1989); *People v. Mohit, supra,* 579 N.Y.S.2d at 993, 999.[22]

In *Mohit*, the court hit the nail on the head in the following revealing passage:

If, as will be found in this case, a reliable match is made, but the probabilities attached are not reliable, should the proponent of the evidence be denied its admissibility altogether? Shouldn't the jury know that there was a match and that the possibility of the perpetrator being someone other than the defendant is remote, even if it is difficult to say precisely how remote? If, for example, many in the scientific community would agree that a probability is 1 in 1,000,000, but others, reasonably doubting the accuracy of that number, can only agree to 1 in 100,000, shouldn't a jury at least know the more conservative number? The defendant could not reasonably claim prejudice, and the prosecution could still bring important and reliable evidence to a jury's attention.

579 N.Y.S.2d at 993.

After describing the disagreement among scientists which we have discussed at pages 638–639, *supra,* the judge in *Moh-*

---

**22.** We disagree with Porter's contention that admission of statistics as to the minuscule probability of a random match is unduly prejudicial. "The defendant fails to persuade us that the admission of DNA identification evidence will lead to an improper trial by mathematics." *People v. Adams,* 195 Mich.App. 267, 278, 489 N.W.2d 192, 198 (1992). As the court stated in *Martinez, supra,* 549 So.2d at 697,

[i]f we adopt Martinez's position, we will exclude statistical probability testimony where it is the most cogent.... Indeed, [the defense logic] might lead to the exclusion of fingerprint evidence, which also is based on the mathematical theory of probabilities that the chance of two individuals bearing the same

fingerprint (or prints) is so infinitesimally small as to be negligible.

In *State v. Brown,* 470 N.W.2d 30 (Iowa 1991), the court, after quoting from the foregoing passage in *Martinez,* observed that "statistical evidence does not remove the issue of identity from the jury, which is free to disregard or disbelieve expert testimony." *Id.* at 33; *accord, Adams, supra,* 195 Mich.App. at 278–80, 489 N.W.2d at 198. *See also State v. Garrison,* 120 Ariz. 255, 258, 585 P.2d 563 (1978) (en banc) (trial court properly admitted testimony that the teethmarks on the decedent's breast were consistent with those made by Garrison and that the chances of another person having made them were about eight in one million).

*it* stated that "the fact that it is difficult, given the present state of knowledge, to be precise, does not mean that conservative numbers cannot be used." *Id.* 579 N.Y.S.2d at 999. Expressing confidence that "no credible segment of the scientific community would claim that the probability estimates ... in this case or any other could be higher than 1 in 100,000, *id.*[23] (rather than 1 in 67,000,000 as claimed by the People), the judge held that the prosecution would be permitted to introduce evidence of the match, but that the FBI probability estimates would be limited in accordance with his decision. *Id.* We agree with this analysis.

### F. Identifying the Consensus.

We leave to the trial judge the initial determination as to whether the requisite consensus now exists for a conservative statement of the probability of a coincidental match and, if so, what the probability is in the present case. We do so, in part, because this issue was not focused upon by the court and counsel during the *Frye* hearing.[24] Although it appears improbable, in light of recent events, that no conservative consensus can be found, it would be unfair to Porter for the appellate court to proclaim *ex cathedra* the precise (and minimal) probability of a coincidental match without a crossing of swords on the issue in the court below.

The information presently before the court suggests, however, that the odds against a match being the result of a coincidence are extremely high even if one uses the most conservative reasonable calculation.

In *Barney, supra,* the court admitted evidence that the blood of one of the defendants and the evidentiary sample in his case "shared an unusual blood type found in only 1.2 persons out of 1000 in the Black population." 8 Cal.App. 4th at 828, 10 Cal. Rptr.2d at 748. In holding that the trial judge had committed error (but harmless error) when he admitted evidence that the probability of a coincidental DNA match was one in two hundred million, the court recognized

> the irony in finding a frequency estimate of 1.2 in 1,000 to be significant while excluding DNA evidence which would have to be in error by *five or six orders of magnitude*—a degree of error not even claimed by Lewontin and Hartl—to

**23.** Other cases in which probability calculations more conservative than those proposed by the prosecution were admitted into evidence include *Caldwell v. State*, 260 Ga. 278, 288–89, 393 S.E.2d 436, 443–44 (1990) and *Wesley I, supra,* 140 Misc.2d at 331–32, 533 N.Y.S.2d at 659, recently affirmed in *Wesley II.*

**24.** "[P]arties may not assert one theory at trial and another theory on appeal." *D.D. v. M.T.,* 550 A.2d 37, 48 (D.C.1988) (*quoting Hackes v. Hackes,* 446 A.2d 396, 398 (D.C.1982). "Points not asserted with sufficient precision [in the trial court] to indicate distinctly the party's thesis will normally be spurned on appeal." *Hunter v. United States,* 606 A.2d 139, 144 (D.C.1992) (*quoting Miller v. Avirom,* 127 U.S.App.D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967)). These principles apply as rigorously to the government as they do to a criminal defendant who faces the loss of his liberty. Even on appeal, the government continues to rely principally on the argument that consensus exists as to a probability of one in thirty million—a notion which we emphatically reject in this opinion. (The government does make an alternative argument in its initial and reply briefs in support of a more conservative statement of the probability of a coincidental match.)

We think the question whether a more conservative consensus exists is nevertheless properly before us. First, the authoritative NRC REPORT. which was issued well after the *Frye* hearing, provides important support for use of a more conservative figure, as do several recent decisions issued since Judge Kennedy's ruling, including *Mohit* and *Bridgett.* The judge anticipated that the NRC REPORT might change things, and he should be given the opportunity to determine if it has done so. Second, admission of evidence of a coincidental match probability of, say, one in thirty thousand is arguably "lesser included" relief where the prosecutor has sought to elicit testimony that the odds are one in thirty million. Finally, the case is one of general public importance, and, as our first venture into the subject, has the potential for becoming a significant precedent in this jurisdiction. So long as procedural fairness is preserved—and we think our remand procedure preserves it, for Porter has had or will have an opportunity to address all relevant issues—it is imperative that a case in which so extensive a record has been developed be decided in conformity with correct legal principles.

approach a reduced equivalence. This does not, however, undermine our finding of no general acceptance, but rather underscores the need to find a low threshold of agreed statistical significance for DNA evidence.

*Id.* at 826 n. 6, 10 Cal.Rptr.2d at 748 n. 6.[25]

In *Bridgett,* Judge Richter rejected the government's proffered probability evidence, agreeing with Judge Kennedy that the prosecution had failed to demonstrate general acceptance of the FBI's methodology. The judge nevertheless held that a more conservative estimate based on the NRC REPORT's "modified ceiling principle" was admissible. Having noted the standing and impartiality of the authors of that study,[26] the judge wrote as follows:

> This present lack of consensus should not, however, exclude probative DNA evidence if the deficiencies can be corrected through the use of conservative estimates. Indeed, the NAS report assumed that certain populations may be stratified or substructured and that such a phenomenon would not be evident in the frequencies employed by the FBI since the Hardy–Weinberg rule is a poor test to detect disequilibrium. The report concluded, however, that such deficiencies should not function to completely exclude DNA evidence from the courtroom, but may be corrected by ensuring that the probability estimates of a coincidental match between the evidentiary and known samples are "appropriately conservative."

> The report formulated a methodology, the ceiling principle, which calculates the chance of a random match and incorporates the criticisms leveled by opponents of the FBI's methodology. Since the ceiling principle may not be employed until the proper population sampling is computed, the committee has formulated a modified ceiling principle: In effect, a more conservative version of the conservative ceiling principle. The modified ceiling principle may be employed at present since the frequencies are taken from existing databases. This modified formula requires that the largest frequency from the current databases be used for the defendant's allele frequencies. Once this frequency has been determined, one calculates the 95% upper confidence limit, or applies a frequency of 10%, whichever is larger. The committee recommends the use of the 10% frequency floor to account for the unsampled populations' allele frequencies.

> This Court finds this formula appropriate under *Frye* for determining the probability estimates to be applied to a match declaration.

120 Daily Wash.L.Rptr. at 1704 (footnotes and citations to NRC REPORT omitted).

No appeal from the decision in *Bridgett* is before us, and we do not at this point rule definitively on Judge Richter's analysis and conclusion. On remand, the court

---

**25.** In *Barney,* the calculation which lacked consensus had already been received in evidence. The court was therefore in no position to direct that a more conservative figure be placed before the jury. This was likewise true in *Lanigan, supra,* in which the court reversed a conviction after the admission of a calculation of one in 2.4 million for which there had been no showing of general acceptance in the scientific community. 413 Mass. at 156–58, 596 N.E.2d at 312–13.

**26.** The National Academy of Sciences (NAS) published [its] report on forensic DNA typing in the interim between the decision rendered in the *Porter* case and the oral arguments held in this case. That report reinforced the general reliability of forensic DNA typing and, although it noted the dissension in the scientific community over the calculations employed by DNA typing laboratories, the NAS provided an alternative calculation scheme. This definitive report is central to the Court's determination. A review of the committee members reveals that the committee itself is a distinguished cross section of the scientific community. Indeed, committee members included Dr. Eric Lander, an outspoken critic of the FBI's methodology and one whose views were forthrightly promoted by the defense in this case and in *Porter.* Thus, that committee's conclusion regarding the reliability of forensic DNA typing, specifically RFLP analysis, and the proffer of a conservative method for calculating probability estimates can easily be equated with general acceptance of those methodologies in the relevant scientific community. Indeed, in terms of the spectrum of existing scientific scholarly opinion, the report falls well towards the cautious end. 120 Daily Wash.L.Rptr. at 1702 (footnotes omitted).

and counsel should address the holding in *Bridgett* and its potential applicability in this case.[27]

## IV

## CONCLUSION

For the foregoing reasons, the trial court's order denying the government's motion to introduce DNA evidence is vacated and the case is remanded to the trial court for further proceedings consistent with this opinion.

*So ordered.*[28]

MACK, Senior Judge, dissenting:

I would affirm the order of Judge Kennedy. I am tempted to say that I would do so for many of the reasons stated by the majority. However, since I emphatically disagree with the disposition of this case, I write to express my reasons.

In vacating the order of Judge Kennedy, and remanding for consideration in light of the holding by another trial judge in another case not before this panel (*see United States v. Bridgett*, 120 Daily Wash.L.Rptr. 1697, 1700–01 (D.C.Super.Ct. May 29, 1992)), my colleagues are issuing a polite invitation to Judge Kennedy to reverse himself in the interest of "a search for truth."[1] I respectfully decline to join in that invitation because I believe (1) that Judge Kennedy correctly applied the standard, of *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923), that a scientific technique sought to be admitted must be sufficiently established to have gained general acceptance in the particular field in which it belongs, and (2) that he was correct in holding that the admission of DNA evidence, with its multifarious but integral facets, had not gained general acceptance with respect to a critical aspect and therefore should await further studies. I also believe that the comprehensive report of the Committee on DNA Technology in Forensic Science (published by The National Research Council[2] in 1992) does not re-

---

27. We note that in three very recent decisions in which it was held that FBI match probability calculations had been improperly received, the courts have expressly endorsed what the Supreme Judicial Court of Massachusetts has described as "[t]he national call for considered, conservative approaches to DNA testing, such as the use of ceiling frequencies." *Lanigan, supra,* 413 Mass. at 163, 596 N.E.2d at 316; *accord, Barney, supra,* 8 Cal.App. 4th at 821–22, 10 Cal. Rptr.2d at 745; *see also Vandebogart, supra,* —— N.H. at —— ——, 616 A.2d at 494–95 (remanding to trial court for a determination whether there is general acceptance of NRC's recommended ceiling principle). Judge Richter's general approach in *Bridgett* is thus in excellent company.

28. The parties and amicus have asked us to address a number of procedural and other issues which we decline to reach. In light of our basic holding, however, we do not think that extensive *Frye* hearings will be necessary in future DNA litigation. *See, generally, Jones, supra,* 548 A.2d at 43–46. Some pretrial inquiry may be necessary in some cases to identify a conservative estimate of the probability of a random match. If there is some persuasive reason to doubt that the FBI or private laboratory has conscientiously followed its own protocol and conducted the procedures correctly, however, the trial court should also hold a pretrial hearing on that limited issue. *See, e.g., State v. Jobe,* 486 N.W.2d 407, 419 (Minn.1992); *People v. Castro,* 144 Misc.2d 956, 977–78, 545 N.Y.S.2d 985, 998 (Supreme Ct. Bronx County 1989).

1. The sentence "[a] criminal trial is not a game but 'a quest for truth'" is repeated in *Womack v. United States,* 350 A.2d 381, 383 (D.C.1976) (citing other omitted opinions) where the issue was whether a trial court had abused its discretion in directly questioning a witness—an obviously different issue from that of a ruling on the admissibility of evidence, particularly the admissibility of a new and novel scientific methodology. Surely we are not suggesting that in the interest of a search for truth, a court may admit the inadmissible.

In this regard the comments of Professor Lawrence A. Tribe [citing Hart & McNaughton, *Evidence and Inference in the Law,* EVIDENCE AND INFERENCE 48, 52 (D. Lerner ed. 1958) ] are pertinent:

It would be a terrible mistake to forget that a typical lawsuit, whether civil or criminal, is only in part an objective search for historical truth. It is also, and no less importantly, a ritual—a complex pattern of gestures comprising what Henry Hart and John McNaughton once called "society's last line of defense in the indispensable effort to secure the peaceful settlement of social conflicts."

*See* Lawrence A. Tribe, *Trial by Mathematics: Precision and Ritual in the Legal Process,* 84 HARV.L.REV. 1329, 1376 (1971).

2. Members of the Council are drawn from the Councils of the National Academy of Science, the National Academy of Engineering and the Institute of Medicine.

quire any other result, but in fact reinforces Judge Kennedy's analysis with respect to the nonacceptance of the FBI's methodology for calculating probabilities of guilt. *See* COMMITTEE ON DNA TECHNOLOGY IN FORENSIC SCIENCE, NATIONAL RESEARCH COUNCIL, DNA TECHNOLOGY IN FORENSIC SCIENCE (1992) [NRC REPORT].

## I.

In my view, the existence of controversy between scientists negates the existence of general acceptance. If the suggested premature bent of my colleagues prevails in this jurisdiction, an unknowing Mr. Porter, an unsuspecting panel of jurors, and ultimately scores of hapless lawyers and judges will be engulfed in a sea of controversy. This is neither an answer to crime nor a wise use of potentially exciting resources of science. I reach this conclusion because the specific issue here is not whether a scientific "fingerprint" is admissible as evidence in a criminal trial; it is rather whether a computer-assisted mathematical computation designed to show the probability of guilt or innocence, and valid only if certain assumptions about the genetic structure of certain Census Bureau populations are in turn valid, is admissible, in the face of a bitter debate among distinguished population geneticists, and in the absence of any direct population studies of the conglomerate of races and ethnic groups (with subgroups) that make up America. The implication by my colleagues that the NRC Committee report (which this court can read for itself) requires vacation and remand is not warranted. The report does not disavow controversy but expressly concedes it. I read the interim suggestions and assumptions advanced by the Committee, as being made in the interest of trying to solve the controversy through compromise, not as indicating general acceptance. I read them as words of caution, not only directed to the jurisdictions which have, in unwarranted haste, committed themselves to the admissibility of DNA evidence but also to those jurisdictions which are considering the issue. Before I state my reasons for doing

so let me briefly turn to the opinion which we are reviewing.

## II.

I was impressed by Judge Kennedy's immediate recognition of the difficulty of applying a *Frye* test to forensic DNA analysis—a task far more demanding than clinical analysis since it involved a feature (the making of "probability estimates") which is completely foreign to clinical analysis. The complexity, he noted, stems from the fact that DNA evidence draws upon principles and technology from a number of different scientific spheres and implicates the study of history and sociology as well. It was the "assumptions" about population genetics that gave him cause for pause—assumptions made without convincing proof that Caucasians, Blacks, and Hispanics are homogeneously mixed populations without significant subgroups. The FBI's failure to recognize diverse subpopulations, Judge Kennedy thought, could produce tremendous error. And because, he reasoned, the "probability feature" was at the very core of DNA evidence, such evidence was "at this time" inadmissible in the cases before him.

## III.

The NRC study is a compendium of expert and extremely helpful commentary detailing the technical aspects of DNA analysis, its exciting possibilities, its complexity, and its immense power. It speaks to the advantages and disadvantages of present methodology (including that at issue here), and the implications attendant to its use by the legal system and to society as a whole. It candidly speaks of controversy with respect to sensitive and constitutional matters, and of the need for regulation.

At the outset the report tells us what DNA is not. Comparing DNA profiles and latent fingerprints, the Committee notes, *inter alia* that where it exists, DNA evidence will often be more probative than fingerprints but that fingerprints are more highly individualized than the DNA profiles based on the present technology being used in forensic laboratories. NRC REPORT,

112–13. "Only when DNA technology is capable of sequencing the entire three billion basepairs of a person's genome could a DNA pattern be considered to be as constant and complete as a fingerprint pattern." *Id.* at 112. More significantly, in what I see to be a confirmation of Judge Kennedy's conclusion that the "probability feature" is at the very core of DNA evidence, the Committee notes "[t]o say that two [DNA] patterns match, without providing any *scientifically valid estimate ...* of the frequency with which such matches might occur *by chance,* is meaningless. The Committee recommends *approaches for making sound estimates that are independent of the race or ethnic group of the subject." Id.* at 9 (emphasis added).

The report suggests that courts, in jurisdictions without relevant statutes, judicially notice the appropriateness of the theoretical basis of DNA typing "by using this report, similar reports, and case law" and adds that "[a]s new methods are used the courts will have to assure themselves of their validity." NRC REPORT, 145. It reviews the state and federal case law that has accepted or rejected the admissibility of such technology, including the opinion of Judge Kennedy in the instant case, and specifically offers advice to parties in the legal system as to pitfalls to be avoided.

*Id.* at 146–47. If there is one recurring theme that surfaces again and again it is the suggestion that accuracy and reliability, and thus acceptability require methodology that is independent of the race and ethnic group of a subject.

Significantly, in a clarifying foreword to the report, the Committee, apparently disturbed by what it characterized as a press "misrepresentation"[3] (subsequently corrected) stated its recommendation, "to avoid potential confusion," that the use of DNA analysis for forensic purposes be *continued,* and that *no moratorium* be declared while the changes and improvements suggested in its report were being made.[4] I read this foreword as constituting guidance to the courts that have previously admitted DNA evidence. I also read the report and its recommendations for reform as confirming that the technology is still in a stage of discovery;[5] in my view it adds credence to Judge Kennedy's ruling that the FBI's method for calculating the "probability" of a coincidental match was not yet accepted as technically reliable, and reinforces the wisdom of the trial court's caution in exercising judicial restraint in the absence of essential studies. I suggest that we, in what my colleagues describe as our "quintessentially appellate function," should exercise the same caution. *See*

3. On Tuesday, April 14, 1992, headlines in the New York Times read "U.S. Panel Seeking Restriction on Use of DNA in Courts, Labs' Standards Faulted, Judges are Asked to Bar Genetic "Fingerprinting" Until Basis in Science is Stronger." Gina Kolata, N.Y. TIMES, April 14, 1992, at A1, C7.

The text begins: "[A] long-awaited Federal report on a powerful new genetic technique for identifying criminal suspects says it should not be allowed in court in the future unless a more scientific basis is established." It quotes a defense lawyer who predicts reopening of cases and a prosecutor who terms the Committee's report "irresponsible." *Id.*

4. The NRC foreword reads in relevant part:

We recommend that the use of DNA analysis for forensic purposes, including the resolution of both criminal and civil cases, be continued while improvements and changes suggested in this report are being made. There is *no need for a general moratorium* on the use of the results of DNA typing either in investigation or in the courts.

We regard the accreditation and proficiency testing of DNA typing laboratories as *essential to the scientific accuracy, reliability, and acceptability* of DNA typing evidence *in the future.* Laboratories involved in forensic DNA typing should move quickly to establish quality-assurance programs. After a sufficient time for implementation of quality-assurance programs has passed, courts should view quality control *as necessary for general acceptance.* (NRC REPORT, foreword (emphasis added)).

5. The NRC REPORT emphasizes that new methods for demonstrating individuality in a person's DNA are in a stage of development. Acknowledging that methods outlined in the report will likely be superseded by other new methods, the NRC cautioned that

[c]are must be taken to ensure that DNA typing techniques used for forensic purposes do not become 'locked in' prematurely. Otherwise, society and the criminal justice system will not be able to derive maximal benefit from advances in the science and technology. (NRC REPORT, 49.)

*Ibn–Tamas v. United States,* 455 A.2d 893, 895 (D.C.1983) (Gallagher, J., concurring). "[S]cientific evidence by its nature necessarily has a special impact on a jury. This is why the judiciary should proceed with reasonable caution, where the evidence comes as a new scientific theory, as distinguished from a well established field...." [6] *Id.*

## IV.

What is this probability feature that is so critical to the validity of DNA technology in the forensic arena? It is, under the circumstances of the methodology sought to be used here, the "game" which my colleagues say a criminal trial is not. It is not a clinical analysis but a mathematical calculation based upon theoretical models. The FBI expert appearing before Judge Kennedy confirmed that he was not testifying that a DNA match resulted in a positive match or identification. In describing the steps taken to rule on the probability of obtaining a coincidental match in any one case, he spoke of preparing a profile data base from blood samples of a "particular population" (Caucasian, Black, Hispanic & American Indian), measuring the frequency of each category of "bands" in that sample population ... assuming the independence of each band and applying a multiplication rule. He used the example of a dice game to illustrate the process: [7]

> Let's take a pair of dice. Each one, assuming they're honest dice or die, is

independent of the other. You throw one, you have one chance in six of getting a particular number. The same with the second. If you throw both of them together, you have one chance in 36 of getting two numbers, the same numbers, two sixes or two ones or whatever, because those are independent events. You multiply the frequency or the probability of one die becoming a six and the other die becoming a six and you generate a number one in 36.

With genetics it's slightly different because ... this profile can be obtained in two different ways. The top band can be from the mother and the bottom band can be from the father [or vice versa]. And so the profile frequency is determined by multiplying the frequency of one band which is six percent times the frequency of the second band which is five percent times two since these profiles can be obtained in two different ways.

This number then in this example, .008, is the frequency of this two band profile. Assuming these are accurate numbers in the population.

It's equivalent to saying there is one individual in every hundred and twenty five that have this particular profile.[8] (Trial Transcript, Jan. 2, 3, 1991 at 128–29.)

This multiplication exercise is commonly referred to as the "product rule."

---

**6.** *See also* Richard Lempert, *Some Caveats Concerning DNA as Criminal Identification Evidence: With Thanks to the Reverend Bayes,* 13 CARDOZO L.REV. 303, 336 (1991):

> While the law must admit the possibility that what most scientists "know" is wrong, in deciding what is scientifically sound a court can do no better than to proceed on the assumption that what scientists generally know is correct. But if there is substantial dissensus within the relevant scientific community, or if in a certain sphere the scientists who are most expert in a matter disagree with the conclusions of other scientists, the evidence should be excluded for the time being. Given the general adequacy of trial procedures at any particular point in time, we should not risk overwhelming the jury with information whose validity rests on propositions that are questioned by many knowledgeable scientists.

> If the skeptical scientists are wrong, a consensus regarding where the truth lies should emerge soon enough, and little harm is likely to occur in the meantime.

**7.** One court has explained a product or multiplication rule by reference to a population of 10 automobiles and the probability of selecting (sight unseen) one of a certain model or a certain color. *People v. Wesley,* 140 Misc.2d 306, 533 N.Y.S.2d 643 (N.Y.Crim.Ct.1988).

**8.** It is unclear how the frequency of the two band profile of .008 was computed based on the preceding example which multiplied the frequency of one band (6 percent) times the frequency of the second band (5 percent) times two. This equation provides a two band frequency of .006, not .008. [2(.06 × .05) = .006].

In 1763, a philosopher, Rev. Thomas Bayes suggested a mathematical formula for "Solving a Problem in the Doctrine of Chance," a formula combining intuitive guesses with probabilities based on frequencies, see Prof. Tribe, 84 HARV.L.REV. 1351 et seq, discussing Bayes' Theorem. Reverend Thomas Bayes, An Essay Toward Solving a Problem in the Doctrine of Chance, PHILOSOPHICAL TRANS. OF THE ROYAL SOCIETY (1763). See also NRC REPORT at 85. To my knowledge, our trial courts (at least prior to the time of the present controversy) have not been asked to admit testimony or argument employing the "product rule" in the weighing of evidence.

Professor Tribe, in a highly technical and exhaustive analysis, uses a California case to illustrate the risk of seduction by mathematical probabilities. He suggests that "the relative obscurity that makes them at once impenetrable by the layman and impressive to him—creates a continuing risk that he will give such arguments a credence they may not deserve and a weight they cannot logically claim." 84 HARV. L.REV. at 1334. He concludes that overall (with possible defined exceptions) the costs of attempting to integrate mathematics into the fact-finding process of a legal trial outweigh the benefits.

In the California case in question, the state Supreme Court reversed a conviction for robbery after a trial during which a probability theory was placed before a jury. See People v. Collins, 68 Cal.2d 319, 438 P.2d 33, 66 Cal.Rptr. 497 (1968). The case involved the robbery of an elderly woman. The victim and her neighbor testified that they had seen a young Caucasian woman with blond hair run from the scene into a yellow car driven by a black male with a mustache and beard. Several days later the police arrested a couple fitting this description. Id., 68 Cal.2d at 321, 438 P.2d at 34, 66 Cal.Rptr. at 498.

In *Collins* the issue at trial was identity. The prosecutor called as a witness a mathematics instructor who testified that the probability of the occurrence of six mutually "independent" events (i.e., yellow automobile, man with mustache, girl with pony tail, girl with blond hair, Negro man with beard, interracial couple in car) was equal to the product of the individual probabilities that each event would occur. Applying the product rule and assigning a probability for each of the six events, the prosecutor calculated, and argued, that there was one chance in twelve million that a randomly chosen couple would fit the description provided by the witness. 68 Cal.2d at 325, 438 P.2d at 36–37, 66 Cal.Rptr. at 501.

In holding the mathematical testimony and the prosecutor's argument inadmissible, the California Supreme Court gave four reasons for its rejection of the product rule: (1) that there was no empirical evidence to support the assumed individual probabilities, (2) that even if the assumed probabilities were themselves correct, the multiplication presumed the independence of each factor (which was unsupported and plainly false), (3) that (the product rule notwithstanding) there remained a substantial possibility that the prosecution's witnesses could be mistaken or lying or that the couple could have been disguised, and (4) that it was error to equate the probability that a randomly chosen couple would possess the incriminating characteristics with the probability that any given couple possessing these characteristics would be innocent.[9]

The California Supreme Court concluded that the product rule "would inevitably yield a wholly erroneous exaggerated result even if all of the individual components had been determined with precision." *Collins, supra,* 68 Cal.2d at 329, 438 P.2d at 39, 66 Cal.Rptr. at 503. The Court warned that "mathematics, a veritable sorcerer in our computerized society, while assisting

---

**9.** The error has been explained as follows: If there were 24 million couples in the suspect population, and if the probability that a couple, chosen randomly from the suspect population, having the same characteristics was one in twelve million, then two such couples exist in this population. Thus, the probability that any given couple, possessing these characteristics, would be innocent is approximately one in two, and not one in twelve million. Lawrence A. Tribe, 84 HARV.L.REV. at 1336.

the trier of fact in the search for truth, must not [be allowed to] cast a spell over him." 68 Cal.2d at 320, 438 P.2d at 33, 66 Cal.Rptr. at 497.

## V.

From this analysis, a stark conclusion emerges. While one thinks of mathematics as a precise science, the result one reaches depends upon the numbers one factors into the equation. In any attempt to integrate the product rule into the fact-finding process of a trial, certain assumptions must be made. Events to which assumed probabilities are assigned must be independent of each other and the assumed probabilities must be supported by empirical evidence. The possibility of error must be ruled out. Otherwise the application of multiplication will simply magnify beyond reason a basic error.

In the instant case we are not only applying assumed objective frequencies to obviously subjective probabilities but, in the absence of more refinement, we are applying obviously subjective frequencies to subjective probabilities. Thus in the DNA analysis employed in this case, this product or multiplication process would be reliable only if the conditions of the so-called "Hardy–Weinberg" rule were met. While my colleagues summarily deal with what they term the "esoteric" principles of the "Hardy–Weinberg equilibrium" or "linkage disequilibrium," this is precisely what the "bitter controversy" which they describe (lifted from the opinion of Judge Chin in a California case)[10] is about.

The NRC Committee details this controversy. As the Committee stresses, again and again, the validity of the multiplication rule employed by the FBI depends upon the absence of population substructure, because only in this special case are the different alleles (or polymorphisms) statistically uncorrelated with one another (as Hardy–Weinberg equilibrium requires).[11] The NRC Committee, assuming the absence of population substructure, has described the calculation as follows:

Suppose for example, that [a defendant] has a genotype $a^1/a^2$, $b^1/b^2$, $c^1/c^1$. If a random sample of the appropriate population [i.e., the fixed bin] shows that the frequencies of a1, a2, b1, b2 and c1 are approximately 0.1, 0.2, 0.3, 0.1 and 0.2, respectively, then the population frequency of the genotype would be estimated to be [2(0.1)(0.2)] [2(0.3)(0.1)] [(0.2)(0.2)] = 0.000096, or about 1 in 10,-417.[12]

**10.** *See People v. Barney, et al.,* 8 Cal.App.4th 798, 10 Cal.Rptr.2d 731 (1st Dist.1992).

**11.** One court describes the Hardy–Weinberg requirements thusly:

> For a test to be reliable, two basic conditions must be met: 1.) the alleles that are tested for must not be the result of linkage disequilibrium; and 2.) the data base population must be in or approach Hardy–Weinberg equilibrium.
> The first condition is met by seeking alleles from different chromosomes. This increases the probability that the segments measured occurred randomly, rather than being the product of one parent's genetic contribution.
> Hardy–Weinberg equilibrium assumes that allele frequencies in the population will remain constant from generation to generation so long as there is random mating in the population. Of course, small deviations from Hardy–Weinberg equilibrium exist in human communities for a number of reasons, including the fact that human mating is not, in its truest sense, random.
> If the population is in Hardy–Weinberg equilibrium, a probability that a DNA with eight identified rare alleles will occur is determined by multiplication of the eight individual probabilities, e.g., $1/a \times 1/b \times 1/c \times 1/d \times 1/e \times 1/f \times 1/g \times 1/h$. It is easy to see that if the probability of each of these alleles occurring is but 1 in 10, the probability of all eight appearing in the same individual is 1 in $10^8$ or 1 in a hundred million. If but two of the alleles occur only in 1 of a hundred individuals, the resulting probability of all eight alleles matching becomes one in ten billion. It is easy to see just how powerful this identification tool is and what a tremendous impact it could have on a jury.

*State v. Pennell,* 584 A.2d 513, 517 (Del.Super.1989).

**12.** NRC Report, 78–79. After one does the initial multiplication (accounting for the fact that the profiles can be obtained in two different ways), the equation would be:

$$96/1,000,000 = 1/X$$

$$96X = 1,000,000$$
$$X = \frac{1,000,000}{96}$$
$$X = 10,416,666$$

To sum up, under this method, population frequencies quoted for DNA typing are based not on actual counting but on theoretical models based on the principles of population genetics. Each matching allele is assumed to provide statistically independent evidence and the frequencies of the individual alleles are multiplied together to calculate the frequency of the complete DNA pattern. Yet it is only now that population studies are being undertaken to validate the assumptions of the absence of substructure.

The difficulty that the courts have had in applying this product rule is summed up by the Committee as follows:

> Statistical interpretation of DNA typing evidence has probably yielded the greatest confusion and concern for the courts in the application of DNA to forensic science. Some courts have accepted the multiplication rule based on the grounds of allelic independence, others have used various ad hoc corrections to account for nonindependence, and still others have rejected probabilities altogether. Some courts have ruled that it is unnecessary even to test allelic independence, and others have ruled that allelic independence cannot be assumed without proof. The confusion is not surprising, inasmuch as the courts have little expertise in population genetics or statistics. (NRC REPORT, 89.)

In the instant case, at time of the hearing before Judge Kennedy, the FBI, using its fixed bin system, had calculated Mr. Porter's four-locus probability estimate as 1 in 40 million. After the issuance of the preliminary National Academy of Sciences report, this estimate was recalculated as being 1 in 270,000. We have not been told the details as to the calculation.[13] The view of my colleagues that reputable scientists "would agree on such minimal figure as the bottom line of the possibility of a coincidental match," prompts me to revisit the controversy which necessitated the report in the first place.

## VI.

The debate among population geneticists underlying the use of the multiplication rule is currently described by the Council's study essentially as follows. One group (Lewontin and Hartl) maintains that census categories—such as North American Caucasians, Blacks, Hispanics, Asians, and Native Americans—are not homogeneous groups but that each group is an admixture of subgroups with somewhat different allele frequencies. Allele frequencies have not been homogenized because people tend to mate within their subgroups. Subpopulation differentiation cannot be predicted in advance but must be assessed through direct studies of allele frequencies in ethnic groups. Furthermore, this group doubts that the presence of substructure can be detected by the application of statistical tests to data from large mixed populations.

Another group of population geneticists (Chakraborty and Kidd), while recognizing the possibility or likelihood of population substructure, concludes that evidence to date indicates that multiplication of gene frequencies across loci does not lead to major inaccuracies in the calculation of genotype frequency, at least not for the specific polymorphic loci examined.

I gather further, from exhibits and pleadings before us that there are disagreements between population geneticists as to fundamental principles which are essential to the validity of the product rule. Thus Lewontin and Hartl point to theoretical misunderstandings about the term "random mating" which has two different meanings. In the narrow sense the term applies to blood groups and other marker genes that do not have a direct effect on a person's appearance. In a broader sense "random mating" means that individuals choose their mates without regard to "endogamy"—i.e., religion, ethnicity, geography, etc. Therefore, in the Lewontin/Hartl view the census term "Hispanics" is misleading since it embraces a "biological hodgepodge" of Mexican, Puerto Rican, Guatemalan, Cuban, Spanish and other an-

13. The Public Defender Service, appearing before this court as amicus in oral argument, indicated that this figure was proffered without explanation as to how it was calculated.

cestries. Reliable probabilities for "Blacks" cannot be estimated without use of a reference population that is at least geographically relevant[14] and takes family history into account. "Caucasian" Americans are derived from genetically diverse European subgroups that migrated to North America only in recent generations and that have tended to maintain their ethnic and religious separateness in marriage. As a consequence under this rationale (1) there existed no single homogeneous reference group to which all individuals could be referred for estimating probabilities of a random match of DNA type, and (2) the multiplication rule for calculating probabilities across multiple VNTR [variable number of tandem repeats] loci would not apply.

Further exhibits show that another group of geneticists (Budowle and Stafford), responding to Lewontin and Hartl, countered that empirical data shows that the effect of population subgroups within the United States on the final statistical element is small and that the FBI's fixed-bin approach was designed intentionally to minimize differences between subgroups, both geographic and ancestral. It argued that a comparison of fixed bin frequency data for Caucasians from the United States, Canada, France, Israel, Switzerland and Australia demonstrates that in most cases there are few or no differences for bin frequencies and the most extreme differences are no more than two to threefold. It attacked Lewontin data as consisting of extremes and outliers. As to Hispanics,

the FBI approached the expected differences from a "geopolitical" perspective. Suggesting that Lewontin and Hartl had intimated that there are more genetic differences between ethnic groups (e.g., Irish and Swiss) than between racial groups (Black and Caucasian) Budowle and Stafford geneticists wrote: "It is intuitively obvious that persons of the same race share more common traits than do persons of different races." NRC REPORT, 86.

There is also controversy about the effect of passing generations on the existence of substructures.[15]

Into this fray the NRC Committee, noting that the Hardy–Weinberg test is very weak for testing substructure, states:

> Differences between races cannot be used to provide a meaningful upper bound on the variation within races. Contrary to common belief based on difference in skin color and hair form, studies have shown that the genetic diversity between subgroups within races is greater than the genetic variation between races. . . .
>
> In summary, population differentiation must be assessed through direct studies of allele frequencies in ethnic groups. Relatively few such studies have been published so far, but some are underway. Clearly, additional such studies are desirable. (NRC REPORT, 82.)

The Committee's report further expresses concern about the discrepancies in frequency estimates that can result from "as-

14. The blood samples in the Black database underlying Mr. Porter's initial probability estimate were collected in South Carolina, Florida and Texas.

The FBI expert pointed out that use of this Black database operated to produce odds in favor of Mr. Porter. I am not certain that this is the kind of affirmative action that an accused would embrace with much enthusiasm. *See, e.g.,* note 15, *infra.*

15. As the majority correctly notes, it is not for the courts to resolve a dispute between scientists. I mention the following only to echo the Committee's emphasis upon direct studies.

The October 1992 issue of "Ebony" magazine tells the poignant story of a distinguished law

professor at the University of Iowa who, born into white middle-class comfort in suburban Washington, D.C., discovered that he was Black at 10 years old (and describes the chaos that followed thereafter. [This comes as no surprise to older generations of the slave states who are not only aware of communities and towns where "coloreds" (including octoroons, mulattoes and quadroons, many with white complexions, blond hair and blue eyes) perpetuated sub-grouping, but who also remember the disappearance of migrating family members (thus coining the phrases of "passing" and "crossing over"). See "Ebony," February 1957, "How to Tell a Negro."] Charles Whitaker, *The True Story of an Indiana 'White' Boy Who Discovered that He Was Black,* EBONY, Oct. 1992, at 88.

sumptions" about population structure as opposed to counting "matches," noting:

> Substantial controversy has arisen concerning the methods for estimating the population frequencies of specific DNA typing patterns. Questions have been raised about the adequacy of the population databases on which frequency estimates are based and about the role of racial and ethnic origin in frequency estimation. Some methods based on simple counting produce modest frequencies, whereas some methods based on assumptions about population structure can produce extreme frequencies. (NRC REPORT, 74–75.)

Noting that in one investigation frequency estimates ranged from 1 in 500 to 1 in 739 billion, the report makes a most significant observation:

> The discrepancy not only is a question of the weight to accord the evidence (which is traditionally left to a jury), *but bears on the scientific validity of the alternative methods used for rendering estimates of the weight* (which is *a threshold question for admissibility*). (NRC REPORT, 75 (emphasis added)).

## VII.

The Committee, mindful of the controversy concerning population genetics, proposes its own methodology, one assuming the existence of population substructure. It recommends that blood samples be obtained from 100 randomly selected persons in each of 15–20 relatively homogeneous populations, and that the DNA in lymphocytes be immortalized and preserved as a reference standard for determination of allele frequencies in different laboratories. The collection of samples and their study should be overseen by a National Committee on Forensic DNA typing (NCFDT) whose mission would be independent of law enforcement. In applying the multiplication rule, the highest allele frequency found in any of the 15–20 populations or 5% (whichever is larger) should be used. This is the "ceiling principle." *See* NRC REPORT, 93.

In the interval ("which should be short") while the reference samples are being collected, the 95% upper confidence limit of the frequency of each allele should be calculated for separate United States "racial" groups and the highest of these values or 10% (whichever is the larger) should be used in applying the multiplication rule. Population databanks should be openly available for scientific inspection by parties and laboratory error rates should be measured with appropriate proficiency tests. *Id.*

We need not quibble over whether the Committee's "conservative modification of a ceiling principle," proposed for an interval time period, would meet the admissibility standard of general acceptance in view of the intensity and depth of the scientific controversy. Admittedly those of us in the law might have some personal concern about an acceptable risk of error to which we are willing to subject an accused.[16] However, the issue here is whether we should rush to vacate *Porter*, a decision carefully drafted, after momentous effort,[17] by the trial judge who conducted the *Frye* hearing—a decision which in rationale has voiced the same concerns as that of a committee of distinguished scientists. We should certainly refrain from issuing a broad stamp of approval to admissibility of novel scientific evidence particularly in a case where because of available testimony such evidence is not crucial to the search

---

**16.** Professor Tribe has put this thusly:

> Now it may well be, as I have argued elsewhere, that there is something intrinsically immoral about condemning a man as a criminal while telling oneself, "I believe that there is a chance of one in twenty that this defendant is innocent, but a 1/20 risk of sacrificing him erroneously is one I am willing to run in the interest of the public's—and my own—safety."

84 HARV.L.REV. at 1372.

**17.** As the majority points out, Judge Kennedy sat for twenty days, heard testimony from eight expert witnesses, admitted over 110 exhibits, and received over 1,300 pages of briefs. I want to go on record with a commendation for all counsel.

for truth.[18] Such restraint is advisable in view of NRC's admonition that regulation of such powerful potential is critical, and that adequacy of the method used to acquire and analyze samples in a given case bears on admissibility and should be adjudicated on a case by case basis.[19] (Indeed, *Frye* could be interpreted as being antithetical to case by case adjudication.)

Finally, apart from the considerations of *Frye*, from an administrative viewpoint, our criminal justice system cannot ignore the cost of widespread use of DNA typing (expected to run into the tens of millions of dollars a year). The fact that DNA evidence might obviate trials in some cases may be cause for reassurance or fear, depending upon one's point of view.[20]

Man's "search for truth" is a never-ending odyssey. The ultimate issue here, however, is not whether that search should be employed to determine whether Mr. Porter is guilty or innocent of a sexual assault on a complaining witness, but rather whether a hastily developed two-part methodology which reeks of scientific controversy in critical respect, can be employed summarily to undermine a system of individual justice, carefully and painfully crafted over the centuries.[21] I defer to the trial judge, to the legal precedent of *Frye*, and to the

scientific genius that has argued that we are not yet ready.

I respectfully dissent.

---

18. Presumably the testimony of the complainant in this case will not need corroboration.

19. *See State v. Vandebogart,* —— N.H. ——, —— ——, 616 A.2d 483, 493–94 (N.H.1992) (holding that trial court erred in admitting population frequency estimates used by FBI since such statistical techniques are not generally accepted among population geneticists because of the debate regarding population substructure).

20. The Committee has voiced serious concern about privacy rights which state legislation has failed to address. It notes that DNA data banks have the ability to point not just to individuals but to entire families—including relatives who have committed no crime (NRC Report, 87) and that there is greater likelihood that information on minority-group members such as Blacks and Hispanics will be stored or accessed. NRC Report, 25.

In this jurisdiction the daily press has reported that the National Institutes of Health has suspended funding for a conference at a local

university until its organizers can reshape the program to make it clear that NIH does not advocate a genetic explanation for crime. *See* Lynne Duke, *Controversy Flares Over Crime, Heredity,* Washington Post, Aug. 19, 1992, at A4; Samuel Francis, *Genes, Crime and Freedom,* The Washington Times, Sept. 22, 1992, at F1, F4. The African–American oriented press has broached the subject of "eugenics." *See* Alexander B. Jones, The Washington New Observer, Sept. 19, 1992, at 5; Tony Brown's Comments, The Washington New Observer, Sept. 26, 1992, at 2.

21. Professor Tribe has expressed his concern thusly:

Although the mathematical or pseudomathematical devices which a society embraces to rationalize its systems for adjudication may be quite comprehensible to a student of that society's customs and culture, those devices may nonetheless operate to distort—and, in some instances, to destroy—important values which that society means to express or to pursue through the conduct of legal trials. Harv.L.Rev. at 1330.