Tuwana COOK, Appellant,

v.

**EDGEWOOD MANAGEMENT CORPORATION,**
Appellee.

No. 00–CV–1011.

District of Columbia Court of Appeals.

Argued Jan. 24, 2002.

Decided June 12, 2003.

---

Barak Cohen, Student Attorney (No. 9389), and Dorene M. Haney, Supervising Attorney, with whom Tom Spiggle, Student Attorney (No. 10022), Veronica Meade Sheppard, Student Attorney (No. 10011), and Ann Marie Hay, Executive Director, D.C. Law Students in Court, were on the briefs, for appellant.

Lisa J. Dessel, with whom Rena Schild, Washington, DC, was on the brief, for appellee.

Before RUIZ and REID, Associate Judges, and FERREN, Senior Judge.

REID, Associate Judge:

This case concerns a complaint filed by the landlord, appellee Edgewood Management Corp. ("Edgewood") to evict appellant Tuwana Cook, her children and grandchildren, from an apartment unit in a District of Columbia housing complex located in a neighborhood with a reputation for substantial drug activity. The complaint was based on the District of Columbia Residential Drug–Related Evictions Act of 1990 ("the RDEA"), and a federal regulation concerning drug-related criminal activity in federally subsidized housing. After the jury returned a verdict in favor of the landlord, the trial court entered an order granting judgment for possession to Edgewood. Ms. Cook filed a timely appeal. We affirm the judgment of the trial court. We conclude that Ms. Cook received timely notice under the RDEA, and that the notice provided sufficient specificity to allow her to prepare a defense. Furthermore, we hold that the trial court properly concluded that the landlord presented sufficient evidence to allow the case to go to the jury; that under the circumstances of this case, the trial court did not err in refusing to compel the disclosure of the special employee's identity; that the trial court properly admitted into evidence, in this civil case, the results of cobalt field tests conducted by the investigators, based upon their testimony and the routine use of the test by the MPD for years prior to Ms. Cook's trial.

## FACTUAL SUMMARY

According to testimony presented to the jury in this case, Ms. Cook had been residing in a District of Columbia multi-building apartment complex in the Northeast quadrant of the District of Columbia for sixteen years. Ms. Cook occupied a four bedroom apartment in the complex, known as Brookland Manor, with her two daughters, Lawann Spencer, age 31 and Tawala Spencer, 29 years of age, and their eight children, ranging in ages from 3 to 14 years.

Brookland Manor had been plagued by drug activity, at least since 1997. In July 1999, Metropolitan Police Department ("MPD") Investigator Steven Manley moved into an apartment unit at Brookland Manor in order to investigate narcotics trafficking, particularly in the building where Ms. Cook resided. He was assisted by other MPD investigators, Frank Magda and Raymond Stargel. The investigators were involved in organizing controlled purchases of drugs from Ms. Cook's apartment.

The controlled purchases were made by a civilian informant known as a "special employee." The first controlled purchase occurred prior to October 1999, and produced no evidence used in this case. The second controlled purchase by the special employee occurred on or around October 30, 1999. The special employee went to Ms. Cook's apartment and returned with a

small bag of a white rock substance that, according to a police field test, contained a quantity of cocaine.

After the controlled purchase, Investigator Magda obtained a search warrant for Ms. Cook's apartment. While executing the search warrant on November 2, 1999, police officers found a sandwich bag containing forty ziplock bags of a white rock substance in the apartment. A police field test revealed that the substance in the bags contained cocaine. Three individuals were arrested as a result of the seizure of the forty ziplock bags of the white rock substance, including one of Ms. Cook's daughters, later identified as Lawann Spencer.[1]

Another controlled purchase took place in April 2000. The special employee entered Ms. Cook's building and returned with two green ziplock bags of a white rock substance. A field test revealed the presence of cocaine.

A final search of Ms. Cook's apartment, pursuant to a warrant, occurred on Friday, July 28, 2000. Investigator Stargel, who had been involved in several searches of Ms. Cook's apartment and apartment building, including that in November 1999 which resulted in the seizure of cocaine, was assigned to the search team. He found a homemade crack pipe in a purse in Ms. Cook's apartment.

On February 11, 2000, Edgewood served a complaint on Ms. Cook seeking to regain possession of the apartment she occupied because of the drug activity. The case was tried before a jury in August 2000. Investigators Magda, Manley and Stargel were the main witnesses for Edgewood. Two witnesses testified for the defense, Tawala Spencer and Ms. Cook. Tawala Spencer denied any knowledge of drug activity in her mother's apartment. Ms. Cook maintained that she was not at home during the searches of her apartment, that she generally left the apartment at 7:30 a.m. and did not return until 9 or 10 at night, that she had never been arrested, and was unaware of any drug activity in the apartment. She asserted that she did not supervise her daughters since they were grown. She acknowledged on cross-examination that "[her] lease still obligate[d][her] to take responsibility for [her] family members," but maintained that the situation was different because her children were now adults, and they paid the rent.

The jury found in appellee Edgewood's favor after answering nine questions on a special verdict form, which included questions relating to the RDEA, and Ms. Cook's potential defenses under the RDEA, and the federal regulation. In pertinent part, the jury "f[ou]nd by a preponderance of the evidence that the tenant, [a] member of the tenant's household, or ... guests or other person under the tenant's control, engaged in drug related criminal activity on or near [Ms. Cook's] premises," and that Ms. Cook had failed to establish a valid defense. Subsequent to the jury trial, Ms. Cook and her family were evicted from her apartment.

## ANALYSIS

### *The Notice Requirements*

Ms. Cook argues that the trial court erred in failing "to dismiss the criminal activity claim for failure to comply with the appropriate notice requirements." She claims that she thought the complaint was based only on the RDEA, but discovered during the preparation of the joint pretrial

---

1. The other two individuals apparently did not live in the apartment. The United States Attorney's Office declined prosecution.

statement that it also was grounded on a federal regulation. Specifically, Ms. Cook contends that Edgewood "did not notify her of the 'criminal activity' claim with sufficient specificity"; and "did not provide the thirty-day notice required under federal regulation and [District] law for a claim of that type." Edgewood asserts that its "notice provided sufficient information for [Ms. Cook] to prepare a defense," and that it was timely.

■ We are presented with an issue requiring the interpretation of the RDEA. Therefore, we review the matter *de novo*. *In re Estate of Louise Green*, 816 A.2d 14, 16 (D.C.2003) (citations omitted). In interpreting statutory or regulatory provisions, we look first to the plain meaning. *See J. Parreco & Son v. Rental Hous. Comm'n*, 567 A.2d 43, 45 (D.C.1989).

D.C.Code § 45–2559.2(a) (1996), now codified as § 42–3602(a) (2001), provides in pertinent part: "[A] housing provider may commence an action to recover possession of a rental unit .... The recovery ... shall be ordered if the Superior Court of the District of Columbia ... has determined by a preponderance of the evidence that the rental unit is a drug haven ...." Notice to the tenant is required. Section 45–2559.2(b), now codified as § 42–3602(b), specifies that: "A notice of the action shall be served upon the tenant or occupant and housing provider at least 5 days prior to a hearing."

■ There is no thirty-day notice requirement in the RDEA. Indeed, the plain meaning of § 45–2559.2(b) leaves no doubt that a landlord seeking to recover possession of a rental unit under the RDEA must provide only five days notice to the tenant prior to the hearing on the complaint. Ms. Cook was served with Edgewood's "Notice to Quit and Vacate For Maintaining Drug Haven and Termination Notice" on January 12, 2000. The notice gave Ms. Cook ten, rather than the minimally required five days notice. And, Edgewood's complaint for possession was not filed until February 7, 2000. Hence, there can be no doubt that notice was timely under the RDEA.[2]

■ Nor can there be any doubt that Ms. Cook was put on notice concerning a violation of the RDEA. The notice to quit stated in pertinent part: "The tenant, authorized occupants or invitees are using the rental unit as a Drug Haven in violation of D.C.Code § 45–2559.1, et seq. of the Drug Related Evictions Act of 1980"; and that these individuals were "engaged in illegal drug activity in or around the property." Furthermore, the notice mentioned the November 1999 search warrant, the seizure of cocaine from Ms. Cook's apartment, and the arrest of Ms. Spencer and two other individuals. Under the circumstances, the notice to quit contained sufficient specificity to inform Ms. Cook of the basis for the landlord's complaint to recover her apartment unit.

### The Sufficiency of the Evidence and the Alleged Evidentiary Errors

We turn first to the sufficiency of the evidence claim. Ms. Cook contends that the trial court erred in failing to grant her motion "for judgment as a matter of law on the drug haven claim." She maintains that "no facts were alleged or proven to establish any of the [RDEA's] seven elements." The landlord argues that ample evidence was presented to allow the case to go to the jury and that "the presen[ce] of any one of the [statutory factors] enumerated in § 45–2559(a) [§ 42–3602(a)] is

2. Because of our disposition of this appeal solely on the RDEA ground, we do not reach any of Ms. Cook's contentions pertaining to the federal criminal activity regulation, 24 C.F.R. § 247.6(c) (1989).

sufficient to find that the rental unit is a drug haven."

■■■ "We review [a denial of] motions for judgment as a matter of law *de novo.*" *Landise v. Mauro,* 725 A.2d 445, 452 (D.C. 1998) (reference omitted). "Judgment as a matter of law may be granted only if, viewing the evidence in the light most favorable to the opposing party, there is 'no legally sufficient evidentiary basis for a reasonable jury to find' for the non-moving party." *Railan v. Katyal,* 766 A.2d 998, 1006 (D.C.2001) (quoting Super. Ct. Civ. R. 50). In our review, we "must take care to avoid weighing the evidence, passing on the credibility of witnesses or substituting [our] judgment for that of the [trial court] or jury." *Alliegro v. ACandS Inc.,* 691 A.2d 102, 105 (D.C.1997) (citations and internal quotation marks omitted).

The RDEA was enacted in 1990 by the Council of the District of Columbia, with a ten-year sunset provision,[3] as a means of eliminating drug trafficking in housing accommodations. It was designed to permit "housing providers, resident associations and other citizens [to] initiate expedited eviction proceedings against tenants when there is a preponderance of evidence that rental units have been or are being used for illegal drug activities." COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON CONSUMER AND REGULATORY AFFAIRS, COMMITTEE REPORT ON BILL NO. 8–194, THE RESIDENTIAL DRUG–RELATED EVICTIONS ACT OF 1990, AMENDMENT IN THE NATURE OF A SUBSTITUTE,

(January 24, 1990) ("Council Report, 1990").

Since April 1996, the RDEA has defined a "drug haven" as "a housing accommodation, or land appurtenant to or common areas of a housing accommodation where drugs are illegally stored, manufactured, used, or distributed." D.C.Code § 45–2559.1(2) (§ 42–3601(8)).[4] In pertinent part, § 45–2559.2(a)[5] provides guidance in ascertaining whether a rental unit is a drug haven:

> In making the determination that the rental unit is a drug haven ..., the Court shall consider:
>
> (1) Whether a tenant or occupant of the rental unit has been charged with a violation of Chapter 5 of Title 33, or the Controlled Substances Act of 1970, ... due to activities that occurred within the housing accommodation that contains the rental unit, or has violated a term of parole or probation for a previous conviction under Chapter 5 of Title 33, or the Controlled Substances Act of 1970, ...;
>
> (2) Whether the rental unit has been the subject of more than 1 drug-related search or seizure that has resulted in the arrest of a tenant or occupant;
>
> (3) Whether a firearm has been discharged within the rental unit;
>
> (4) The testimony of any witness concerning the possession, manufacture, storage, distribution, use, or the at-

---

**3.** The RDEA was re-enacted in 2000. *See* D.C. Law 13–172, § 1302, 47 D.C.Reg. 6308 (2000).

**4.** In 1996, the Council of the District of Columbia "remov[ed] the requirement ... that the illegal storage, manufacture, use or distribution of drugs must occur during the 180–day period preceding the commencement of an eviction action." *See* COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, COMMITTEE REPORT ON BILL 11–70, THE ABATEMENT

OF CONTROLLED DANGEROUS SUBSTANCES NUISANCE ACT OF 1996, April 16, 1996, at 3 (April 16, 1996). Bill 11–70 became D.C. Law 11–176, 43 D.C.Reg. 4234 (1997).

**5.** When the RDEA was re-enacted in 2000, there was a technical modification of § 45–2559.2(a)(1) by changing the reference to "Chapter 5 of Title 33," to "the Uniform Controlled Substances Act." D.C.Code § 42–3602(a)(1).

tempted possession, manufacture, storage, distribution, or use of an illegal drug by a tenant or occupant in the housing accommodation that contains the rental unit;

(5) The general reputation of the property to corroborate testimony based on personal knowledge or observation, or evidence seized during the execution of a search and seizure warrant, provided, that this shall not, in and of itself, be sufficient to establish the existence of a drug haven...;

(6) Evidence that the drug haven ... had been discontinued at the time of the filing of the complaint or at the time of the hearing, which evidence will not bar the granting of appropriate relief by the Court; or

(7) Any other relevant and admissible evidence that demonstrates that the rental unit is or is not a drug haven ....

D.C.Code § 45–2559.2(a)(1)–(7).

■ "Statutory interpretation is a holistic endeavor, and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter." *United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am., Inc.,* 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (internal quotation marks and citation omitted). "Where the opening clause of a statutory section ended with a colon, the further use of semicolons to set off sub-sections suggested that the sub-sections were closely related to the opening clause and that the sub-sections comprised the list of items of equal or similar importance." 1A NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 21.15 (6th ed.2002) (footnote omitted).

Ms. Cook argues that "no facts were alleged or proven to establish any of the

[RDEA's] seven elements." She also suggests that all seven of the statutory factors must be considered before deciding whether a rental unit is a drug haven.[6]

■ Section 45–2559.2(a) specifies that the court "shall consider" factors (1) through (7), but does not mandate that each and every one of the factors must be met, nor how many, before a rental unit may be declared a drug haven. Rather, the statute lays out factors that the trial court must take into account.

In charging the jury, the trial court stated that the plaintiff had to prove its case by a preponderance of the evidence, the statutory requirement set forth in § 45–2559.2(a). Furthermore, the trial court told the jury: "In determining whether the landlord has proved that the rental unit was used as a drug haven, you shall consider the following," and the trial judge then read the seven statutory factors found in § 45–2559.2(a)(1) through (7).

■ We conclude that in its case-in-chief, Edgewood satisfied at least factors number four ("testimony of any witness concerning the possession ... of an illegal drug by a tenant or occupant in the housing accommodation that contains the rental unit"), five ("[t]he general reputation of the property ..., or evidence seized during the execution of a search and seizure warrant..."), and seven ("any other relevant and admissible evidence that demonstrates that the rental unit is or is not a drug haven"). Hence, dismissal at the end of its main case would have been inappropriate since reasonable jurors could find "a legally sufficient evidentiary basis," *Railan, supra,* 766 A.2d at 1006, for concluding that Ms. Cook's apartment was a drug haven. Investigator Frank Magda testified that he

---

6. Ms. Cook states in her brief: "Even if the landlord proved every allegation of the notice, and nothing else, it still would not be entitled to relief because such proof would not have addressed the factors which constitute the violation."

sent a special employee to make two separate controlled drug purchases from Ms. Cook's apartment. Before being sent to make the purchases, the special employee was searched for both money and narcotics. On both occasions, Investigator Magda instructed the special employee to make the purchase specifically from Ms. Cook's apartment. On the first occasion, the employee returned with a single rock of a substance that turned out to be cocaine. Investigator Magda obtained a search warrant to search Ms. Cook's home based upon the results of the controlled purchase. During the search, the officers found "40 black ziplocks ... in a plastic sandwich baggy under a mattress in th[e] bedroom, and these ziplocks contained a white rock substance"; the bags were removed from Ms. Cook's apartment. Investigator Raymond Stargel testified that he field tested the substance, and found cocaine.

The second controlled buy occurred in April 2000, when the special employee purchased "two ziplocks containing a white rock substance" that appeared to be cocaine. A field test conducted by Investigator Stargel confirmed the presence of cocaine. Finally, on July 28, 2000, a search of Ms. Cook's apartment produced a "[h]omemade crack pipe."

Investigator Steven Manley explained during his trial testimony that he had moved into Brookland Manor because it had been plagued by drug activity. He stated that "[he] received personally a lot of complaints from the management ... about possible drug dealings going on in front of [Ms. Cook's apartment building]." After receiving such complaints, the officers would "walk around the building and try to sneak up on the subjects. And several times we did and would chase them into the building, they would run right into [Ms. Cook's] apartment." Investigator Manley confirmed that the apartment com-

plex had a reputation as a "[v]ery high drug area." In that regard, his statement confirmed the testimony of Investigators Magda and Stargel.

In short, the investigators' testimony addressed at least factors number four, five, and seven of § 45–2559(a). Viewed in the light most favorable to Edgewood, the non-moving party, the trial court concluded correctly that the question of whether Ms. Cook violated the RDEA was "a matter for the jury to decide."

██ Our review does not end at this point because Ms. Cook argues that the trial court committed prejudicial evidentiary errors. She asserts that the trial court abused its discretion by allowing Edgewood to present evidence of controlled buys by the special employee without revealing the identity of that person. Edgewood points out that Ms. Cook "did not seek the identity of the special employee prior to cross-examination at trial"; and that she failed to "provide a basis to find that the revelation of the special employee's identity would have assisted her case at all. . . . "

██ The general rule regarding the disclosure of the identity of a confidential informant and the policy behind the rule has been summarized as follows:

> It is a general rule, subject to certain limitations, but applicable in both criminal and civil cases, that the government is privileged to withhold from disclosure (notwithstanding its relevance) the identity of persons who furnish information relating to violations of law to officers charged with enforcement of the law. The privilege is founded upon public policy, and seeks to further and protect the public interest in effective law enforcement. It recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law en-

forcement officers, and by preserving their anonymity, encourages them to perform that obligation. The privilege is designed to protect the public interest, and not to protect the informer. Annotation, *Government's Privilege to Withhold Disclosure of Identity of Informer—Federal Cases*, 1 L.Ed.2d 1998, at § 1 (footnotes omitted). "We will overturn the trial court's ruling on the question of disclosure of an informer only for an abuse of discretion." *United States v. Lyons*, 448 A.2d 872, 875 n. 6 (D.C.1982) (citations omitted). "The problem [of whether or not to disclose the name of the informer] is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." *Roviaro v. United States*, 353 U.S. 53, 62, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). "[T]he burden of proof is entirely on the defendant. A disclosure request must not be based on mere speculation or suspicion; it must be demonstrated that the informer would have offered testimony helpful to the defense." *Hamilton v. United States*, 395 A.2d 24, 26 (D.C.1978) (citing *United States v. Skeens*, 145 U.S.App. D.C. 404, 408, 449 F.2d 1066, 1070 (1971)); *United States v. Alvarez*, 472 F.2d 111, 113 (9th Cir.), *cert. denied*, 412 U.S. 921, 93 S.Ct. 2742, 37 L.Ed.2d 148 (1973).

Unlike the situation in *Roviaro, supra*, the special employee here was not the only witness to the underlying events that led to Ms. Cook's eviction. Significantly, the informant did not directly participate in either search of appellant's apartment, both of which produced evidence of drug-related criminal activity, and the first of which resulted in the seizure of forty (40) small bags of a substance that tested positive for cocaine. Moreover, although the successful purchases of the special employee in part led to the search of Ms. Cook's apartment, she did not raise any substantial Fourth Amendment issues in her briefs. "Most of the federal cases involving [a] limitation on the scope of the informer's privilege have arisen where the legality of a search without a warrant is in issue and the communications of an informer are claimed to establish probable cause. In these cases the government has been required to disclose the identity of the informant unless there was sufficient evidence apart from his confidential communication." *Roviaro, supra*, 353 U.S. at 61, 77 S.Ct. 623. That is not the case here, where the unchallenged search of Ms. Cook's apartment provided additional evidence apart from the controlled purchases of the special employee.

Furthermore, it is not clear that Ms. Cook could meet her burden of "demonstrat[ing] that the informer would have offered testimony helpful to the defense." *Hamilton, supra*, 395 A.2d at 26 (citations omitted). She does not provide a specific area of impeachment that would help her cause. Nor does she claim, for example, that the special employee may have been a particular individual who harbored a bias against a member of her family, and therefore had a motive to produce evidence through fraudulent means. Instead, she makes general, speculative allegations that the special employee "may have been dishonest" or "may have been arrested on previous occasions" or "was likely recognized by those who sold him the drugs as a drug user and/or dealer." Speculation or suspicion may not serve as a basis for disclosure requests, *see id.* at 26 (citing *United States v. Skeens*, 145 U.S.App. D.C. at 408, 449 F.2d at 1070; *United States v. Alvarez*, 472 F.2d at 113). Not surprisingly, a drug purchasing special employee is likely to be someone who fits comfortably in that environment and who will not raise suspicion that he or she is working with law enforcement agents.

Notably, the police investigators involved in this case took certain safeguards to ensure the integrity of the controlled buys by the special employee. Investigators Magda and Manley testified that they instructed the special employee to purchase drugs from Ms. Cook's apartment and had no reason to believe that the purchaser deviated from the instructions. In addition, the special employee was searched for both money and drugs before making the purchase. Based on their testimony, rather than being helpful to Ms. Cook's challenge, any testimony from the special employee would be damaging to her. Consequently, we cannot agree with Ms. Cook that hers is a case where disclosure should have been required.[7]

We turn next to Ms. Cook's challenge to Edgewood's field test evidence. She insists that "the trial court erroneously allowed in field test evidence presented by Edgewood in an attempt to prove drugs were purchased from an occupant of [Ms. Cook's] apartment." She faults the trial court for admitting the testimony "without any evidence that the procedure was reliable," and argues that "[a]s a result [of such admission], the jurors ... were encouraged to rely on the results of a field test that lacks sufficient accuracy to establish the presence of illegal drugs." Moreover, she claims that "the evidence fails to meet the standard articulated in *Frye*."[8] Edgewood's argument supporting the trial court's admission of the field test results centers on the reliability of the field test and its use in other jurisdictions. In addition, it emphasizes that the lay opinion testimony of the experienced police investi-

gators corroborated the results of the field tests.

▆▆▆▆ Generally, "determinations regarding the admissibility of evidence are confided to the trial court's sound discretion." *Perkins v. United States,* 760 A.2d 604, 608 (D.C.2000). If an issue involves the admission of a "new scientific technique," *see United States v. Porter,* 618 A.2d 629, 635 (D.C.1992), or a "unique, controversial methodology," *see Drevenak v. Abendschein,* 773 A.2d 396, 418 (D.C. 2001), this court reviews the matter *de novo.* Moreover, as we said in *Porter, supra,* "under *Frye,* the proponent of a new technology must demonstrate by a preponderance of the evidence that this technology has been generally accepted in the relevant scientific community." *Id.* at 633.

We first set forth the factual context for the issue of the admissibility of the field test results on the substances seized from Ms. Cook's apartment. The issue was raised during the testimony of Investigator Magda, who had been trained and certified to conduct field tests, and who had performed over 500 field tests by the time of trial. He used a disposable narcotest kit to conduct his field tests. The kit contained a plastic tube with a pink substance at the bottom. The investigator placed a piece of the suspected substance in the tube, and then broke two ampules filled with a cobalt thiocyanate solution into the tube. The mixture in the tube turned to a light blue color, indicating the presence of cocaine.

Investigator Magda stated that the cobalt test was "generally used by the [MPD] to field test cocaine." He con-

---

7. The transcript of the underlying trial supports Ms. Cook's statement in her original brief that "[t]he trial court did an admirable job of sustaining objections to hearsay testimony; [and] the court sustained [Ms.] Cook's motions to strike." Therefore, we do not find

merit in the hearsay and foundation claims emphasized in Ms. Cook's Reply Brief in relation to the special employee issue.

8. *Frye v. United States,* 54 App.D.C. 46, 293 F. 1013 (1923).

firmed that this test was "commonly used after controlled buys made by the [MPD]." Ms. Cook objected when Investigator Magda was asked to indicate the results of the field tests, and the court allowed one of her attorneys to *voir dire* Investigator Magda. His responses to questions posed by the attorney primarily established that the cobalt test kit was used "throughout the police force"; that the field test is "preliminary" after which the substance is sent to the DEA lab; and that Investigator Magda was not an expert in narcotics. Edgewood's attorney also questioned Investigator Magda during the *voir dire* and elicited information concerning the use of the cobalt field test "at probable cause hearings" and "to obtain search warrants." At the end of the *voir dire*, Ms. Cook moved to exclude the field test results on the grounds that Investigator Magda was not an expert, and that "there [was] no showing of the reliability of the test in this case." In denying the motion to exclude, the trial judge declared:

> [I]n a preponderance of the evidence civil proceeding, which this is, ... I'm willing to say that a lay expert, which I'm willing to say Officer Magda is, although ... he's not a scientist .... He wouldn't be qualified as a DEA representative would be qualified. But he can certainly testify to what the pattern or practice in the [MPD] is, to the extent to which this particular cobalt test is relied upon in the department. And ... in my judgment that's sufficient to allow the plaintiff to get the results of this preliminary field test in.
>
> You've got some ammunition for cross-examination, and you can use it, but I don't think it's excluded. That's my ruling.

No further objection was made in response to the trial court's ruling.

After the ruling, Investigator Magda described the results of the field tests, and the subsequent steps he took, including the heat sealing, preparation of his report, the chain of custody followed, the deposit of the package in a locked box for pick up and delivery to the DEA lab, and the process for obtaining the search warrant for Ms. Cook's apartment. On cross-examination, the investigator acknowledged that the controlled buy substances in this case were not sent to the DEA for analysis. On redirect examination, Investigator Magda responded "yes" to the question: "Have you had occasion to have the results of your field test confirmed by further tests by the DEA".

Investigator Stargel testified that he had attended "training in the identification [and] handling of narcotics and drug paraphernalia," including instruction in field testing for which he has received certification. He assisted in the search of Ms. Cook's apartment in 1999, and conducted a field test on "a portion" of the substance that was seized. He had administered some 200 cobalt field tests at the time of trial. Similar to the testimony of Investigator Magda, he described the cobalt field test which confirmed the presence of cocaine in the ziplock bags removed from Ms. Cook's apartment, and the steps taken after the test was performed. He acknowledged on cross-examination that there was no indication that his field test results had ever been sent to the DEA for further testing.

The testimony of both Investigators Magda and Stargel highlights the fact that the MPD had used the cobalt test for many years and relied on it to obtain search warrants and to show probable cause. Nothing in the record suggests that in 1999, it was a novel test, or "a new scientific technique," or that it was regarded as a "unique controversial methodology," *see Porter, supra; Drevenak, supra.* Thus, *Frye, supra,* is inapplicable to this

case, and Edgewood had no burden "to demonstrate by a preponderance of the evidence that [the cobalt test] has been generally accepted in the relevant scientific community." *Porter, supra,* 618 A.2d at 633.

In addition, and significantly, Ms. Cook's case is not a criminal case where the standard for conviction is extremely high—beyond a reasonable doubt. Here, we are confronted with a civil case where Edgewood was required to establish that Ms. Cook's apartment was a drug haven by only a preponderance of the evidence. Other jurisdictions have recognized the distinction between a criminal trial and other types of cases in determining the admissibility of drug field test results. For example, in *People v. Swamp,* 84 N.Y.2d 725, 622 N.Y.S.2d 472, 646 N.E.2d 774 (1995), the court concluded that an indictment charging the defendant with possession of cocaine was " 'legally sufficient to establish that [the] person [charged] committed such offense.' " *Id.* at 776. The court held that "formal laboratory analysis of the substance seized from the defendant" was not essential. Rather, testimony of "the officer who performed the field test" was sufficient. There, the officer "recounted the observations that led him to conclude defendant possessed cocaine, including the telltale packaging in which the substance was found—a substance that looked like crack-cocaine, which he had been trained to identify—and the presence of drug paraphernalia in defendant's car." *Id.* at 777. This

"testimony was probative of whether the substance found in defendant's possession was cocaine, and tended to corroborate the preliminary Scott–Reagent test, a field test routinely relied upon by law enforcement to determine the presence of a controlled substance." *Id.*

Similarly, in our case, Investigator Magda, who had performed over 500 cobalt field tests, maintained that the substance contained in the forty ziplock bags looked familiar to him, and that "[i]t looked like crack cocaine." Moreover, the "white rock substance" retrieved by the special employee on the first controlled purchase "looked like crack cocaine." He believed this to be the case "[b]ecause [Investigator Magda had] seen it thousands of times, and crack cocaine looks like a small—little chunks of tan or whitish soap." The suspected drug obtained by the special employee on the second controlled purchase also looked familiar to Investigator Magda, who said that it "looked to [him] to be crack cocaine." Investigator Stargel testified that the substance he took from Ms. Cook's apartment looked like "little miniature ziplocks of crack cocaine" which he had seen previously in conducting "in excess of 200" field tests for crack cocaine. And Investigator Magda, as well as Investigator Stargel, had been trained to conduct field tests, and had been certified to perform the cobalt test, a test that had been used routinely for years by the MPD.[9]

■ As the court opined in *Swamp, supra,* "prima facie evidence of the pres-

---

9. In admitting the results of the field test into evidence, the trial court stated in part:

> I think that the field tests are admissible so long as the appropriate police officers—or officers testify.
>
> . . . .
>
> And that's based on my view that this is a civil matter in which the standard of proof is preponderance of the evidence, vastly different from a criminal case—criminal

prosecution which the standard of proof is beyond a reasonable doubt. Certainly the use of field tests in our Police Department for many years, and the Police Departments across the country that I know of from many cases in this courtroom and courtrooms I presided over, make it clear to me that the preponderance of the evidence standard at the very least is met by a properly conducted field test.

ence of a controlled substance need not be based on expert testimony. All that is required is a 'reliable basis' for inferring such presence." *Id.* at 778 (citation omitted). Later, in *In re Angel A.,* 92 N.Y.2d 430, 681 N.Y.S.2d 787, 704 N.E.2d 554 (1998), the court applied the reasoning in *Swamp* to a juvenile delinquency petition and concluded that "the undercover officer's supporting deposition ... and his reliance on the 'Nik' field test to establish the existence of a controlled·substance, constituted legally sufficient evidence." *Id.* at 556–57. Since the evidence was "legally sufficient," it was admissible. *Id.* at 557. Here, in addition to the testimony of Investigators Magda and Stargel, Investigator Manley testified that he "received ... a lot of complaints from the management ... about possible drug dealings going on in front of Ms. Cook's apartment building," and that when he would chase persons believed to be engaged in drug activity, "they would run right into [Ms. Cook's] apartment." Significantly, during the November 2, 1999, search of Ms. Cook's apartment, the police found a sandwich bag with forty ziplock bags of a white rock substance containing cocaine.

It is also instructive that when the Council of the District of Columbia enacted the RDEA, it referenced a New York case, *Kellner v. Cappellini,* 135 Misc.2d 759, 516 N.Y.S.2d 827 (N.Y.Civ.Ct.1986), a civil case concerning the widespread use and distribution of crack cocaine in New York City, and efforts to rid residential housing of drug activity through evictions. *See* Council Report, 1990, at 8–9. In *Kellner,* a New York civil court held that "[t]he burden of proof upon petitioners under [the New York statute] does not require proof of commission of specific illegal acts but rather proof of the ill repute of the demised premises or those resorting thereto shall constitute presumptive evidence of unlawful use. It is sufficient that the acts and conduct complained of warrant an inference of the illegal purposes for which the premises are being used." *Id.* at 830. Consistent with this history is the fact that the RDEA plainly calls for the consideration of relevant "testimony of any witness":

> In making the determination that the rental unit is a drug haven or that a nuisance exists, the Court shall consider: ... (4) The testimony of any witness concerning the possession, manufacture, storage, distribution, use, or the attempted possession, manufacture, storage, distribution, or use of an illegal drug by a tenant or occupant in the housing accommodation that contains the rental unit[.]

D.C.Code § 45–2559.2(a)(4).

 Based upon our review of the record, the legislative history, and pertinent case law, we hold that the trial court properly admitted the results of the cobalt field test in light of the testimony of Investigators Manley, Magda and Stargel and the routine use of that test by the MPD for years.[10]

---

10. We dispose of Ms. Cook's other arguments summarily. She contends that Edgewood's cross-examination of Tawala Spencer, her daughter who testified for the defense, was "inadmissible and prejudicial" to the extent that it addressed a 1992 drug-related arrest of Lawann Spencer, Ms. Cook's other daughter. Tawala Spencer was asked: "Did you know that [your sister] had been arrested when she was 22 years old for drugs?" We have said repeatedly that: "A decision on the admissi- bility of evidence, of course, is committed to the sound discretion of the trial court, and we will not disturb its ruling absent an abuse of discretion." *Smith v. United States,* 665 A.2d 962, 967 (D.C.1995) (reference omitted). Since there were other references to Lawann Spencer's involvement with drugs, we see no abuse of discretion. Indeed, Ms. Cook stated during her testimony that Lawann Spencer "got locked up" on a marijuana charge in the past.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

Ms. Cook further asserts that the inclusion of the criminal activity claim under the federal regulation "confused the issue before [the jury] and led [the jurors] to apply an improper standard to the Drug Haven claim." The contention is unpersuasive. The record indicates that the trial court provided thorough instructions in this case, including a recitation of the seven factors to be considered when determining whether a tenant violated the RDEA. *See* D.C.Code § 45–2559.2(a). As we have reiterated on several occasions, "[t]he jury is presumed to have followed the trial court's instructions." *Davis v. United States*, 700 A.2d 229, 232 (D.C.1997) (citations omitted). Moreover, a *nine-question* special verdict form utilized in this case provided additional separation between the RDEA claim and the federal claim. While the first question on the special verdict form related generally to both claims, questions two through five concerned the RDEA, while questions six through nine addressed the federal claim. With respect to the RDEA contention in particular, question two inquired as to whether the landlord had established that appellant's apartment was a drug haven, and questions three through five inquired as to whether appellant had established any defenses to the drug haven claim. All of those questions were answered in favor of Edgewood. During deliberations, moreover, the jury sent a note inquiring "if we answer questions 3–5 [relating to the RDEA,] do we need to answer 6–9 [concerning the federal claim]." This suggests that the jurors questioned whether it was even necessary to address the federal claim, given that they had found in Edgewood's favor on the RDEA claim. Rather than confusion, the special verdict form and the jury note indicate that the jurors were aware of the two separate theories, and had an ability to separate them. The jury instructions in this case, supported by our presumption that the jury followed them, and the special verdict form are sufficient to defeat Ms. Cook's contention that the inclusion of the criminal activity claim "confused the issue before [the jury] and led [the jurors] to apply an improper standard to the Drug Haven claim." We note, finally, that there is no direct evidence in the record that the jury applied any such "improper standard" in this case. For all of these reasons, we reject Ms. Cook's contention.

Ms. Cook also maintains that the trial court erred by allowing "Edgewood [to] introduce[ ] the lease agreement into evidence over [her] objection, as part of its case-in-chief." According to Ms. Cook, the admission of the lease, and evidence relating to her responsibility under it, "allowed Edgewood to read an additional legal standard into the statutes and regulations under which it sued for possession." Stated more specifically, "Edgewood tried to get [Ms.] Cook to admit that she was responsible under the lease for the conduct of those in her apartment." Contrary to Ms. Cook's contention, the admission of evidence relating to Ms. Cook's responsibility under the lease cannot be equated with "read[ing] an additional legal standard into the statutes and regulations . . . ." The RDEA is a broad statute. The prohibitions contained in it apply to "tenants" and "occupants." *See* D.C.Code § 45–2559.2(a). A tenant "means a lessee, sublessee, or other person entitled to the possession or occupancy of a rental unit." D.C.Code § 45–2559.1. An occupant "means any person authorized by the tenant or housing provider to be on the premises of the rental unit." *Id.* Even more broadly, the prohibitions contained in the RDEA apply to activities that occur "within the rental unit" and "within the housing accommodation that contains the rental unit." *See* D.C.Code § 45–2559.2(a). In fact, a jury would be required to consider "[a]ny . . . relevant and admissible evidence that demonstrates that the rental unit is or is not a drug haven or nuisance." *Id.* Thus, the breadth of the RDEA itself indicates that tenants are responsible for the conduct of those in their apartments. The tenant's lease is one of the mechanisms through which the landlord informs the tenant of "[t]he prohibition against illegal activity." Council Report, 1990, at 4. Indeed, during her testimony, Ms. Cook was asked about her lease with Edgewood and whether "that lease still obligate[d her] to take responsibility for [her] family members." She responded, "Yes, it does." Where, such as in this case, the landlord establishes that he or she is proceeding under statutory claims, those claims do not metamorphose into a contractual action because the landlord seeks to admit evidence relating to a tenant's responsibilities under a lease. That evidence merely allows the landlord an opportunity to prove that he or she enforced the prohibitions of the RDEA and related laws, and that Ms. Cook was aware, through the lease, of her responsibility for the actions of family members in her apartment unit. Even if this were not true, it would be extremely difficult for us to hold that a landlord should not be allowed to introduce the underlying lease in an eviction ac-

*So ordered.*

tion. Accordingly, Ms. Cook's contention is unavailing.